**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**
*Electronically Filed*

**K.G. and M.G.,** *by and through*
*their parents and next friends*
**JOHN DOE and JANE DOE,**

        **Plaintiffs,**

                                          **Case No.:_____**

    **v.**

**BOARD OF EDUCATION OF WOODFORD**
**COUNTY, KENTUCKY,** *a Body Corporate*,

**and**

**J.C.S.,** *Individually*
*and in his Official Capacity,*

        **Defendants.**
_____

**COMPLAINT AND DEMAND FOR JURY TRIAL**

    COME NOW Plaintiffs K.G. and M.G. by and through their parents and next friends JOHN and JANE DOE, and sue Defendants Board of Education of Woodford County, Kentucky ("The Board") and J.C.S. for damages and other relief. Specifically, Plaintiffs bring claims for violations of 20 U.S.C. §1681-88 ("Title IX"); 42 U.S.C. §1983; KRS 446.070; and for intentional infliction of emotional distress, false imprisonment and civil battery. Plaintiffs seek all remedies available in law and equity including but not limited to entry of judgment in their favor, entry of judgment for all actual, compensatory and punitive damages, repayment of their attorneys' fees and costs, and injunctive relief.

1

## INTRODUCTION

1.      Plaintiffs John and Jane Doe are the natural parents of minor children K.G. and M.G.  K.G. and M.G. are students at Woodford County High School ("the School") in Versailles, Kentucky. Plaintiffs' claims arise by virtue of Defendants' failure to comply with Kentucky state and federal educational laws with respect to the performance of J.C.S.'s duties as Choir Director and facilitator of extracurricular activities at Woodford County High School.

2.      Beginning in 2017 and continuing until August 2018, J.C.S. (30 years old) engaged in prurient contact with K.G. and M.G. both on and off-campus, including but not limited to unlawful sexual touching and written, verbal and electronic communications of a sexual and abusive nature, including communications transmitted and/or initiated by virtue of the school's electronic devices, databases and/or servers.

3.      The Board (and its authorized agents) had actual and/or constructive knowledge of J.C.S.'s unlawful conduct as early as March 2018, yet failed to act in a manner that guaranteed the safety and security of K.G. and M.G. and other minor students. Specifically, the Board's policies and practices of: (1) not supervising its electronic equipment and databases; (2) not enforcing its prohibitions against unlawful electronic communication; (3) not enforcing its prohibition against sexual harassment at school; and/or (4) not enforcing its reporting and investigative requirements for sexual harassment at school, among other statutory and regulatory violations, were the direct and proximate cause of Plaintiffs' injuries in this case.

4.      Astonishingly, after receiving at least one (1) formal complaint about J.C.S.'s behavior, The Board, by and through its authorized agents, oversaw and approved the scheduling of K.G. as a "Teacher's Aid" during J.C.S.'s "Teacher Planning Period" beginning August 2018

– knowing that K.G. would be alone with J.C.S. for at least an hour and a half each day she was scheduled to report to his classroom.

5.      On Friday, August 10, 2018, K.G. reported to her scheduled class in J.C.S.'s office (a sound-proof room) when J.C.S. proceeded to lock his office door and tell K.G. that he wanted to bend her over his desk and "eat her like a biscuit." On August 14, 2018, K.G. returned for her scheduled planning period block in J.C.S.'s office with her cellular device and recorded the conversations transcribed and attached hereto as Exhibit A, which includes J.C.S.'s insistence K.G. reveal her nipples, J.C.S.'s discussions of his interactions with another female student (age 14) and J.C.S.'s insinuation that his sexual attraction to minor students is okay because "it's natural."

6.      Upon learning of the recording, The Board seized K.G.'s personal cellular device, detained K.G. and told her she would not be permitted to contact her parents until after she had provided a written statement about J.C.S.'s conduct.

7.      On August, 20, 2018, J.C.S. The Board accepted J.C.S.'s "resignation." Upon information and belief, J.C.S.'s teaching certificate remains in good standing.

8.      K.G. and M.G. have suffered irreparable and lasting injuries as a result of Defendants' violations of federal, state and common laws. They seek entry of judgment and all available relief.

## JURISDICTION AND VENUE

9.      This Honorable Court has jurisdiction over Plaintiffs' Title IX and §1983 claims pursuant to 28 U.S.C. §1333 as those claims arise under federal law. The Court has supplemental jurisdiction over Plaintiffs' state and common law claims pursuant to 28 U.S.C. §1367 as those

**claims** are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

10.     Venue is proper as the acts and/or omissions forming the basis of Plaintiffs' claims occurred in Woodford County, Kentucky.

## RELEVANT STATISTICS

11.     Federal regulators estimate that 1 in 10 K-12 students will experience sexual misconduct perpetrated by a school employee by the time they graduate high school.[1] On average, a teacher will be transferred to three (3) different schools before s/he is reported to the police, a process known as "Passing the Trash." *Id.* Approximately 93% of sexual misconduct incidents occur in public schools, 53% occurring at the school or school event, 51% occurring outside of school and 19% occurring online. *Id.* Of the types of incidents reported, 79% involved physical contact, 14% involved non-physical contact and 8% involved both. *Id.* One (1) in three (3) reported offenders had multiple victims. *Id.* Three (3) out of four (4) offenders use technology to communicate with their victims. *Id.*

## RELEVANT STATUTORY AND REGULATORY AUTHORITIES

**I.     Federal Law.**

### Title IX of the Education Amendments of 1972

12.     Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . ." 28 U.S.C. §1681(a).

13.     In 1979, the Supreme Court recognized an implied private right of action to enforce Title IX's prohibition on sex discrimination. *Cannon v. University of Chicago*, 441 U.S.

---

[1] *See* DOJ Data Compilation attached hereto as Exhibit B.

4

677, 690-693 (1979). This private right encompasses intentional sex discrimination in the form a

public school's deliberate indifference to a teacher's sexual harassment of a student, as is the

case here. *See Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 290-291 (1998).

The private right also prohibits retaliation against a person because he or she complains about

sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).

<u>Deprivation of Constitutional Rights.</u>

14.     Title 42, Section 1983 of the United States Code provides that "[e]very person

who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory

or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States

or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured in an action

at law, suit in equity, or other proper proceeding for redress . . ." 42 U.S.C. § 1983.

15.     The Fourth Amendment to the U.S. Constitution guarantees "the right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures . . ." U.S. Const. Amendment IV.

16.     The Fourteenth Amendment to the U.S. Constitution provides that "No State shall

make or enforce any law which shall abridge the privileges or immunities of citizens of the

United States; nor shall any State deprive any person of life, liberty or property, without due

process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

U.S. Const. Amendment. XIV.

**II.     Kentucky Statutory Authorities.**

17.      The Kentucky Legislature recognizes that "[c]hildren have certain fundamental

rights which must be protected and preserved, including but not limited to, the rights to adequate

food, clothing and shelter; the right to be free from physical, sexual or emotional injury or exploitation; the right to develop physically, mentally, and emotionally to their potential; and the right to educational instruction . . ." KRS 620.010.

18.     In Kentucky, "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." KRS 446.070.

19.     In Kentucky, a person in "position of authority" means but is not limited to "the position occupied by a biological parent, adoptive parent, stepparent, foster parent, relative, household member, adult youth leader, recreational staff, or volunteer who is an adult, adult athletic manager, adult coach, teacher, classified school employee, certified school employee, counselor, staff, or volunteer for either a residential treatment facility . . ." KRS 532.045.

20.     A person in "position of special trust" means the "position occupied by a person in a position of authority who by reason of that position is able to exercise undue influence over the minor . . ." *Id.*

21.     Kentucky's Penal Code defines sexual abuse as, among other things as when, "[b]eing a person in a position of authority or position of special trust, as defined in KRS 532.045, [a person], regardless of his or her age, subjects a minor who is less than eighteen (18) years old, with whom he or she comes into contact as a result of that position, to sexual contact or engages in masturbation in the presence of the minor and knows or has reason to know the minor is present or engages in masturbation while using the Internet, telephone, or other electronic communication device while communicating with a minor who the person knows is less than sixteen (16) years old, and the minor can see or hear the person masturbate." KRS 510.110.

22.     Kentucky defines criminal harassment as when, "with intent to intimidate, harass, annoy, or alarm another person, [a person]:  (a)  [s]trikes, shoves, kicks, or otherwise subjects him to physical contact; (b)  [a]ttempts or threatens to strike, shove, kick, or otherwise subject the person to physical contact; (c)  [i]n a public place, makes an offensively coarse utterance, gesture, or display, or addresses abusive language to any person present; (d)  [f]ollows a person in or about a public place or places; (e)  [e]ngages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose . . ." KRS 525.070.

23.     In Kentucky, a person is guilty of "harassing communications" when, "with intent to intimidate, harass, annoy, or alarm another person, he or she: (a) [c]ommunicates with a person, anonymously or otherwise, by telephone, telegraph, mail, or any other form of electronic or written communication in a manner which causes annoyance or alarm and serves no purpose of legitimate communication; [or] (b)  [m]akes a telephone call, whether or not conversation ensues, with no purpose of legitimate communication . . ." KRS 525.080.

24.     School principals, administrators, guidance counselors and teachers have affirmative reporting duties in the Commonwealth.

25.     School principals, administrators, guidance counselors and teachers have affirmative reporting duties in Woodford County.

26.     For example, "[w]hen the principal has a reasonable belief that an act has occurred on school property or at a school-sponsored function involving assault resulting in serious physical injury, a sexual offense, kidnapping, assault involving the use of a weapon, possession of a firearm in violation of the law, possession of a controlled substance in violation of the law, or damage to the property, the principal shall immediately report the act to the

appropriate local law enforcement agency. For purposes of this section, 'school property' means any public school building, bus, public school campus, grounds, recreational area, or athletic field, in the charge of the principal."  KRS 158.154.

27.     Moreover, "**[a]ny person** who knows or has reasonable cause to believe that a child is dependent, neglected, or abused **shall** immediately cause an oral or written report to be made to a local law enforcement agency or the Department of Kentucky State Police; the cabinet or its designated representative; the Commonwealth's attorney or the county attorney; by telephone or otherwise . . ." KRS 620.030. (emphasis added).

28.     Kentucky Law mandates personnel training in matters of child neglect and abuse at Kentucky's public schools.

29.     For example, KRS 156.095 provides that "[t]he Kentucky Department of Education shall establish, direct, and maintain a statewide program of professional development to improve instruction in the public schools" and that "[e]ach local school district superintendent shall appoint a certified school employee to fulfill the role and responsibilities of a professional development coordinator who shall disseminate professional development information to schools and personnel." *Id.*

30.     Likewise, "[t]he Kentucky Department of Education shall develop and maintain a list of approved comprehensive evidence-informed trainings on child abuse and neglect prevention, recognition, and reporting that encompass child physical, sexual, and emotional abuse and neglect." *Id.*

31.     The trainings referenced in paragraph 30 above shall cover, at a minimum, the following topics: recognizing child physical, sexual, and emotional abuse and neglect; reporting suspected child abuse and neglect in Kentucky as required by KRS  620.030 and the appropriate

documentation; responding to the child; and understanding the response of child protective services. *Id.*

32.     Each local school board shall adopt one (1) or more training(s) from the list approved by the Department of Education to be implemented by schools. *Id.*

33.     All current school administrators, certified personnel, office staff, instructional assistants, and coaches and extracurricular sponsors who are employed by the school district shall complete the implemented training(s). *Id.*

34.     The day-to-day supervision, management and operation of Kentucky's public schools are vested in each school's principal.

35.     School principals are responsible for assignment of all instructional and non-instructional staff time. KRS 160.345.

36.     School principals are responsible for assignment of students to classes and programs within the school. KRS 160.345.

37.     School principals are responsible for determining the schedule of the school day and week, subject to the beginning and ending times of the school day and school calendar year as established by the local board. KRS 160.345.

38.      School principals are responsible for determination of use of school space during the school day related to improving classroom teaching and learning. KRS 160.345.

39.     School principals are responsible for planning and resolution of issues regarding instructional practices; selection and implementation of discipline and classroom management techniques as a part of a comprehensive school safety plan, including responsibilities of the student, parent, teacher, counselor, and principal; and selection of extracurricular programs and

determination of policies relating to student participation based on academic qualifications and attendance requirements, program evaluation, and supervision.  KRS 160.345.

40.     School principals are responsible for implementing procedures, consistent with local school board policy, for determining alignment with state standards, technology utilization, and program appraisal. KRS 160.345.

**III.     Kentucky Regulatory Authorities.**

41.     Kentucky Administrative Regulation 7:160 establishes the requirements for the use of physical restraint and seclusion of students in public schools. Section (1)(15) defines "seclusion" as "the involuntary confinement of a student alone in a room or area from which the student is prevented from leaving . . ." KAR 7:160 (115).

42.     Section 4, KAR 7:160 provides that "[s]eclusion shall not be used in a public school or educational program: (a) [a]s punishment or discipline; (b) [t]o force compliance or to retaliate; (c) [a]s a substitute for appropriate educational or behavioral support; (d) [t]o prevent property damage in the absence of imminent danger of physical harm to self or others; (e) [a]s a routine school safety measure; (f) [a]s a convenience for staff; or (g) [a]s a substitute for timeout." *Id.*

43.     Moreover, "[s]eclusion may only be implemented in a public school or educational program if: (a) [t]he student's behavior poses an imminent danger of physical harm to self or others; (b) [t]he student is visually monitored for the duration of the seclusion; (c) [l]ess restrictive interventions have been ineffective in stopping the imminent danger of physical harm to self or others; and (d) [s]chool personnel implementing the seclusion are appropriately trained to use seclusion." *Id.* at Section (3).

44.     Additionally, a setting used for seclusion shall: (a) [b]e free of objects and fixtures with which a student could inflict physical harm to self or others; (b) [p]rovide school personnel a view of the student at all times; (c) [p]rovide adequate lighting and ventilation; (c) [b]e reviewed by district administration to ensure programmatic implementation of guidelines and data related to its use; (d) [h]ave an unlocked and unobstructed door; and (e) [h]ave at least an annual fire and safety inspection." *Id.* at Section (4).

45.     Kentucky Law requires that the Education Professional Standards Board develop a professional code of ethics.

46.     The Professional Code of Ethics for Kentucky Certified Personnel is codified in 16 KAR 1:020, establishes the ethical standards for Kentucky certified school personnel, and establishes that violation of the code may be grounds for revocation or suspension of Kentucky teacher or administrator certification. *See* KRS 161.028.

47.     Certified Personnel Employees of Woodford County are bound by the Professional Code of Ethics.

48.     Kentucky's Professional Code of Ethics provides, in pertinent part, that Certified Personnel in the Commonwealth:

    a.      Shall respect the constitutional rights of all students;

    b.      Shall take reasonable measures to protect the health, safety, and emotional well-being of students;

    c.      Shall not use professional relationships or authority with students for personal advantage;

    d.      Shall not engage in any sexually related behavior with a student with or without consent, but shall maintain a professional approach with students. Sexually related

11

behavior shall include such behaviors as sexual jokes; sexual remarks; sexual kidding or teasing; sexual innuendo; pressure for dates or sexual favors; inappropriate physical touching, kissing, or grabbing; rape; threats of physical harm; and sexual assault. 16 KAR 1:020.

## IV.   Woodford County Guidelines

49.    The Board of Education of Woodford County promulgates its own Policies and Procedures, including but not limited to the following:

a.    Policy 03.1321 ("Use of School Property"): District owned telecommunication devices shall be used primarily for authorized District business purposes. However, occasional personal use of such equipment is permitted. *Id.*

b.    Policy 03.13214 ("Use of Personal Property/Cell Phones/Telecommunication Devices"): When an audio, video, or combined recording is made of a student while on school property, during a school sponsored event, or while being transported by the School District, **the recording constitutes an education record of each student recorded, regardless of the ownership of the device utilized to create the recording** . . . Once a recording is created, **employees must comply with all applicable record retention laws, regulations and policies concerning educational records** . . .This policy applies to any personally owned device which has the capacity to record audio and/or video, including but not limited to, cell phones and tablets. *Id.* (emphasis added).

c.    Policy 03.162: ("Discrimination/Harassment"):  Examples of prohibited conduct are nicknames, slurs, stories, jokes, written or electronic materials or pictures that are lewd, vulgar, demeaning or profane; and/or unwanted touching, sexual advances, requests for sexual favors, and spreading sexual rumors. *Id.*

12

d.      Policy 03.162 (continued): Employees who believe they or any other employee, student or visitor is being or has been subjected to harassment/discrimination **shall**, as soon as reasonably practicable, **report it**. In each school building, the Principal is the person responsible for receiving reports of harassment/discrimination at the building level. . . Complaints of harassment/discrimination, whether verbal or written, **shall** lead to a **documented investigation and a written report**. *Id.* (emphasis added).

e.      Policy 09.2212: ("Use of Physical Restraint and Seclusion"). Seclusion means the involuntary confinement of a student alone in a room or area from which the student is prevented from leaving. *Id.*

f.      Policy 09.227: ("Child Abuse"). Any teacher, school administrator, or other school personnel who knows or has reasonable cause to believe that a child under the age of eighteen (18) is dependent, abused or neglected, or a victim of human trafficking shall immediately make a report to a local law enforcement agency or the Kentucky State Police, the Cabinet for Health and Family Services or its designated representative. *Id.*

g.      Policy 09.227: ("Child Abuse") (continued). After making the report, the employee shall notify the Principal of the suspected abuse, who then shall also promptly make a report to the proper authorities for investigation. *Id.*

h.      Policy 09.227: ("Child Abuse") (continued). Copies of reports kept by the District that are submitted to authorities in compliance with the child abuse law are educational records and subject to inspection by the parents of the alleged victim(s). *Id.*

i.      Policy 09.227: ("Child Abuse") (continued). All current school administrators, certified personnel, office staff, instructional assistants, coaches and

extracurricular sponsors shall complete Board selected training on child abuse and neglect prevention, recognition, and reporting. *Id.*

            j.      Policy 09.227 AP.1: ("Child Abuse/Neglect/Dependency"). District employees who receive information from or about a student that causes them to know or gives them reasonable cause to believe that a child is dependent, neglected, abused or is a victim of human trafficking will promptly make an oral report to the proper authorities . . . [and] [a]ll employees who know or have reasonable cause to believe that a child is dependent, neglected, or abused have the responsibility to report. Any attempt to prevent such a report is illegal. The individual making an oral report should make a personal record of the report, including the date and time of report and name of the individual to whom the report was made. *Id.*

## THE PARTIES

50.    Defendant Board of Education of Woodford County ("The Board") is a body politic and body corporate with perpetual succession. Woodford Co. Policy 01.1.

51.    The Woodford County School District, including Woodford County High School and J.C.S., are and were at all times relevant under the management and control of the Board. *Id.*

52.    At all times relevant, The Board and The School were operating in the Commonwealth of Kentucky under color of state law.

53.    The Board of Education of Woodford County serves approximately 4,100 students county-wide.

54.    In 2017, Woodford County Public Schools reported gross revenues of $73,763,874.86. Of this amount, approximately $16.4 million came from local sources, approximately $17.3 million came from the Commonwealth of Kentucky and approximately $40

million came from federal sources. *See* Woodford County Public Schools Annual Financial Report for FY 2017, *available online at* www.woodford.kyschools.us.

55.     At all times relevant, Woodford County High School ("the School") is and was a public school receiving federal financial assistance as defined by 28 U.S.C. § 1681(a).

56.     Defendant J.C.S. was, at all times relevant, the Choir Director at Woodford County High School.

57.     At all times relevant, J.C.S. was an employee of the School and the Board.

58.     At all times relevant, J.C.S. was acting under color of state law.

59.     Upon information and belief, J.C.S. is a resident of Fayette County, Kentucky.

60.     J.C.S. is being sued in both his individual and official capacity.

61.     John and Jane Doe are residents of Woodford County, Kentucky.

62.     John and Jane Doe are the natural parents of minor children M.G. and K.G.

63.     At all times relevant, M.G. was a student at Woodford County High School and under the age of eighteen (18).

64.     At all times relevant, K.G. was a student at Woodford County High School and under the age of eighteen (18).

## THE FACTS

65.     In 2016, J.C.S. was hired to be the Choir Director at Woodford County High School.

66.     K.G. and M.G. were, at all times relevant, active in the School's Choir Program.

67.     During their participation in on- and off-campus school choir activities, K.G. and M.G. were under the direct control and supervision of J.C.S. in his capacity as Choir Director for the School.

68.     For the period 2016 to 2018, J.C.S. maintained a sound-proof office located inside the School's on-campus choir room.

69.     For the period 2016 to 2018, J.C.S. utilized the office in his choir room to evaluate (individually) the vocal progress and performance of his students, including K.G.

70.     Inside J.C.S.'s office were multiple electronic recording devices, including two school-owned computers, a personal computer and a cellular telephone device.

71.     When in use on school property, J.C.S.'s electronic recording devices were connected to the School's internet and intranet "network" ("WCPSNet").

72.     J.C.S. also utilized and had access to a third-party electronic application utilized by the Board and the School to send reminder notifications to students called "Remind App."

73.     At all times relevant, J.C.S. had the ability to lock his choir room office door from the inside to prevent others from entering while he was inside.

74.     As early as 2017, J.C.S. showed a special interest in K.G. and other females in the School's choir.

75.     At first, J.C.S. behaved in a way that was overly complimentary, saying things like "you look beautiful today" or "I like that top on you" or "you have a beautiful voice."

76.     In 2017, J.C.S. obtained K.G.'s personal cell phone number from the School's RemindApp and began texting K.G. on her private cell phone from his cellular device both on and off campus.

77.     Woodford County School Board has a policy and practice of permitting teachers to communicate with their students directly using RemindApp.

78.     At first J.C.S. texted K.G. to remind her about extracurricular activities and upcoming choir events. Eventually, J.C.S.'s texts became inappropriate and sexual in nature.

79.     J.C.S.'s comments and texts about K.G.'s body and appearance continued in 2017 and 2018.

80.     J.C.S. contacted K.G. using other apps, including but not limited to Facebook, Instagram and Snapchat.

81.     J.C.S. also opened several fake social media profiles so he could "follow" and "watch" K.G. online (one such account is referred to as a "Finsta" – a "fake" Instagram account).

82.     In 2017 and continuing through 2018 J.C.S. told K.G. that he "loved her."

83.     In 2017 and continuing through 2018 J.C.S. downloaded photographs of K.G. from K.G.'s Facebook account onto one or more electronic devices.

84.     On one occasion while in his office, J.C.S. showed K.G. a photo of herself in a bikini he had downloaded from K.G.'s Facebook profile and saved to his computer stating "I wish I could see right through that" and "why don't you look at me when I'm talking to you?"

85.     J.C.S.'s comments made K.G. uncomfortable.

86.     J.C.S.'s comments were unwanted.

87.     J.C.S. promised K.G. he would give her lead roles in the school play as long as she told no one about his advances.

88.     During the relevant time periods, J.C.S. did give K.G. a lead role in a school play.

89.     In January 2017, N.G., another student at the School witnessed inappropriate communications (text messages) between J.C.S. and K.G. while on campus and informed the School's administrators that he believed K.G. was afraid and/or uncomfortable because of the texts.

90.     In response to this complaint, School Principal Robert Akres and School Resource Officer Buddy Flora approached Jane Doe at a school basketball game and demanded that Jane Doe retrieve K.G.'s cellular device for inspection. Jane Doe complied.

91.     K.G. was not interviewed at this time. However, her cellular device was seized and inspected without reasonable cause to believe that K.G. had engaged in unlawful conduct.

92.     J.C.S. was waiting outside alone in the hallway during the meeting between Jane Done, Acres and Flora at the above-referenced basketball game. When J.C.S. saw Mrs. Doe leaving the meeting, J.C.S. walked towards her and said "We're really excited about the school play this year."

93.     The following week, J.C.S. called K.G. on her personal cellular device and said "They're watching me. They know about our texts. We have to be careful."

94.     Upon information and belief, neither Acres nor Flora confiscated or reviewed J.C.S.'s cellular or electronic devices.

95.     Upon information and belief, neither Acres nor Flora filed any kind of formal or informal written or oral report concerning this first "investigation" into J.C.S.'s conduct.

96.     Upon information and belief, J.C.S. was never disciplined for sending inappropriate and/or sexual communications to K.G. or any other student prior to August 2018.

97.     Upon information and belief no member of the School's administration and/or the Board reported J.C.S.'s conduct to law enforcement or other state or local authority prior to August 2018.

98.      Eventually, J.C.S. consummated his demand that K.G. stay quiet.

99.     In March 2017. K.G. was given a lead role (Lucy) in the school play "You're a Good Man Charlie Brown."

100.   J.C.S.'s possessive and harassing behavior continued into 2018.

101.   J.C.S. gave K.G. gifts.

102.   J.C.S. bought K.G. apple pies from McDonald's and brought them to school where he gave them to her.

103.   J.C.S. placed gift certificates to Victoria's Secret (a lingerie retailer) in K.G.'s school book bag during the school day.

104.   J.C.S. also bought K.G. "squishy toys" at the mall and brought them to her at school.

105.   K.G. was uncomfortable with J.C.S.'s escalating conduct.

106.   K.G. was afraid that if she complained she would be retaliated against and/or accused of wrongdoing, as evidenced by the prior unlawful seizure of her cellular device.

107.   In April 2018, J.C.S. promised K.G. another role in the school play "Beauty in the Beast." Backstage at the play, J.C.S. hugged K.G. tightly, thrusting his penis against her hips and grabbing her breasts.

108.   Meanwhile, J.C.S. "upped the ante." He befriended K.G.'s and M.G.'s parents. He appeared at their family home on several occasions for social gatherings. On one such occasion he became inebriated and passed out on their living room couch.

109.   On another occasion at the girls' home, J.C.S. told M.G. he would teach her a "breathing technique" to help her sing better in the choir. He insisted that he stand behind M.G.'s body with his arms around her so that he could hold her waist and the undercarriage of her rib cage while she breathed deeply with her back against his chest.  This incident made M.G. extremely uncomfortable. M.G. told him to stop and he did.

110.    The following week in school, J.C.S. called M.G. to his office to "apologize" for the incident at her home. During this meeting, J.C.S. insisted that M.G. hug him to consummate his apology. M.G. was uncomfortable with the request but was afraid of what would happen if she said no while alone in the room with him.

111.    During the "hug," J.C.S. put his hands on M.G.'s buttocks and squeezed. M.G. left J.C.S.'s office angry and humiliated.

112.    J.C.S. grabbed M.G.'s buttocks a second time during the School's *a cappella* group practice after hours. The second time he grabbed her buttocks he thrust his crotch against hers, smiled and said "these are nice" referring to her buttocks.

113.    J.C.S. engaged in similar behavior with K.G. during a sexual embrace at school. The conduct clearly upset K.G., so J.C.S. wrote K.G. a "letter of apology" including the following:

> I know you aren't talking to me right now, so I figured I'd write you instead . . . words can't even express how much I like you and care for you. . . even if you can't love me. Even when I see you I miss you. Even when I hear you, I miss you. I **hate** that you aren't talking to me right now . . . but I understand why . . . you are so special and so dear to me, and I hope that one day you can love me and we can actually be together . . . or at least hand out, maybe even on a proper date! Who knows. I only wish you the very best in this world, as you have been the best in mine. Whether I'm in your life, with you or not, I hope you're the happiest and most successful girl in the world. Despite all the frustration, goofyness [sic] hard times, sassy conversations, cakes and apple pies, I think the world of you. Please never stop smiling, never stop being you, please don't stop writing or talking to me, and don't forget about me. I truly hope we can be together sometime . . . even though I wish that sometime was now. You are irresistible. You are **beautiful**. You are **wonderful**. And you have the voice of an angel that truly melts my heart, just like your smile and eyes. As I said before, words can't even begin to express how I feel for you . . . but I hope this gives you some idea. I know there are different kinds of love in this world. I know we can be different people at times. But I definitely know this: **I love you**, [K.G.], and I always will. I won't be able to always show it or say it, but know that I do, very much, I am so happy that I met you and you're in my life. Things happen for a reason . . . and I like to think you're in mine for the right reasons. Don't be

a stranger, enjoy your Christmas, and if there is anything that I can ever do for
you, you know where to find me. All the best, for the best . . .
(emphasis in original).

114.    By the Spring of 2018, J.C.S. again promised K.G. that she could have lead roles

in the school's drama productions, in exchange for her favor, specifically, his expectation that

K.G. accept and keep quiet about his escalating verbal and physical advances.

115.    J.C.S. also promised K.G. that he would help her get scholarship money for

college. He made these promises in exchange for K.G.'s continued silence.

116.    By the summer of 2018, J.C.S. had embedded himself in every major aspect of

K.G.'s life, often calling her late in the evenings and after school hours.

117.    J.C.S.'s involvement in K.G.'s life became an obsession and was common

knowledge at Woodford County High School.

118.    The first day of the 2018-2019 school year was August 9, 2018. K.G. learned that

she had been selected by J.C.S. to be his Teacher's Aide during his planning period, meaning she

would be left alone with J.C.S. in his classroom for nearly ninety (90) minutes a day. This made

K.G. extremely uncomfortable and afraid for her safety.

119.    The School oversaw and approved of J.C.S.'s scheduling request notwithstanding

the prior complaint about inappropriate communications between J.C.S. and K.G.

120.    On the second day of school (August 10, 2018), K.G. reported to J.C.S.'s

planning period where J.C.S. locked her in his office and said, among other things: "How are you

doing today?" "I missed seeing that pretty face of yours every day?" "Did you lose weight over

the summer?" "I want to flip you over on my desk and eat you like a biscuit."

121.    J.C.S. then showed K.G. copies of some of her Instagram photos that he had

uploaded onto his personal electronic device at school.

122.    K.G. left J.C.S.'s planning period that day afraid to return.

123.    On August 15, 2018, K.G. recorded the conversations transcribed and attached hereto as <u>Exhibit A</u>.

124.    The recordings attached hereto as <u>Exhibit A</u> clearly capture J.C.S. talking about K.G.'s breasts and his desire to see her naked and be with her sexually. *Id.*

125.    K.G.'s classmate reported the recording to the School's Principal.

126.    K.G. was called to the School's office on August 16, 2018. M.G. was called to the office the following day.

127.    K.G. and M.G. were told that they could not call their parents until after they had provided a written statement about J.C.S.'s behavior.

128.    K.G. and M.G. were interrogated on August 16, 2018, by members of the School's administration acting on behalf of the Board.

129.    K.G.'s cellular phone was taken during this meeting and copies of her recordings were uploaded onto the school's database.

130.    Neither K.G. nor M.G. were permitted to contact their parents prior to giving their written statements for use by The Board and its agents.

131.    Neither K.G. nor M.G. consented to the confiscation of their electronic devices by The Board and its agents.

132.    Neither K.G. nor M.G. was permitted to contact legal counsel prior to their interrogation on August 16, 2018.

133.    During 2017 and continuing until August 2018, J.C.S. made multiple prurient comments and demands to K.G., some of which were made using the Board's electronic databases and/or devices.

22

134.    During 2017 and 2018 J.C.S. made the following comments to K.G., among others:

      a.    "Will you send me a photo of you completely naked?"

      b.    "What's the furthest you've ever gone with a guy? Would you go there with me?"

      c.    "Understand that you're beautiful."

      d.    "You can't look bad. It's not possible."

      e.    "You have the most amazing tits ever. I really want to see them."[2]

      f.    "It's just our skin. I'd love to see that."

      g.    "I think you're wonderful and beautiful."

      h.    "It's natural attraction."

      i.    "I want what I want."

135.    The Board did not terminate J.C.S.'s employment.

136.    While confiscating K.G.'s cellular phone, school administrators promised that J.C.S. would not be provided a copy of the recording so as to protect K.G.'s identity.

137.    Upon information and belief, several other students have come forward to complain about J.C.S's inappropriate conduct.

138.    Upon information and belief, J.C.S. was provided a copy of the recording made by K.G. during a meeting with the School Board.

139.    On August 24, 2018, the School Board accepted Mr. J.C.S.'s "resignation."

---

[2] K.G. obsessively wore 2-3 bras to school to prevent J.C.S. from seeing her nipples through her shirt. She also wore hoodies and sweatshirts to hide her figure in hopes that J.C.S. would not make comments about her body.

140.    Beginning on August 16, 2018, and continuing through the date of this Complaint, K.G. and M.G. and their siblings have received threats and harassing comments from their peers at school, including but not limited to the following:

       a.     "You're a whore."

       b.     "You were F***ing him for two years so you must have liked it!"

       c.     "Everyone knows J.C.S. didn't do anything. It was all you!"

141.    The threats and comments received by K.G. and M.G. and their siblings at school are ongoing, some of which have occurred in the presence of school staff and administrators.

142.    The threats and comments received by K.G. and M.G. and their siblings are retaliatory in nature and act to deter others from coming forward to report sexual harassment in school.

143.     The harassment experienced by K.G. and M.G. at the hands of J.C.S. acting in his capacity as a representative and agent of the Board was sexual in nature.

144.    The harassment experienced by K.G. and M.G. was both severe and pervasive.

145.    J.C.S.'s harassment of K.G. was in the form of a *quid pro quo* (i.e. he promised her lead roles in the school's plays, brought her gifts and promised scholarship monies in exchange for unlawful and prurient touching and communications).

146.    J.C.S. retaliated against K.G. after the 2017 complaint about his behavior when he told her to be careful and keep quiet about his conduct.

147.    The Board and its agents failed to prevent unlawful retaliation against K.G. in 2017.

148.    At all times relevant, the Board had actual and or constructive knowledge of the unlawful conduct of J.C.S. because some or all of J.C.S.'s electronic communications were

transmitted on school-owned devices and/or using school purchase, managed and supervised networks, software and/or applications.

149.   At all times relevant, the Board, acting through its authorized agents and representatives, had a duty to keep K.G., M.G. and other minor children safe from J.C.S. and all persons in position of authority or trust who might cause harm – physical, emotional or otherwise.

150.   At all times relevant, the Board, acting through its authorized agents and representatives, had a duty to monitor the electronic devices used by J.C.S. and all persons in a position of authority or trust who, by use of such devices, might cause harm – physical, emotional or otherwise.

151.   The Board breached its duties to K.G., M.G. and others.

152.   J.C.S., both individually and in his official capacity and as a person of authority and in a position of trust, had a duty to abstain from prurient contact with his students.

153.   J.C.S. breached his duties to K.G., M.G. and others.

154.   The Board is liable for damages in this case because:

a.   It had a custom, pattern and/or practice of tolerance or acquiescence in the misconduct alleged herein;

b.   Because the Board and/or its authorized agents engaged in, adopted or ratified the misconduct at issue;

c.   Because the Board's own policies resulted in the violations of federal and state law as alleged herein; and

d.   Because the Board breached its duty to provide sufficient training or supervision to prevent the conduct alleged herein.

155.    J.C.S. exhibited a clear and persistent pattern of physical, sexual and emotional abuse.

156.    The Board, acting through it authorized agents, engaged in tacit approval of J.C.S.'s unlawful conduct such that their deliberate indifference amounted to an official policy of inaction.

157.    K.G. and M.G. have suffered actual and irreparable harm as a result of Defendants' acts and omissions.

## RELIEF SOUGHT

### Count I – Violations of Title IX (Sexual Discrimination/Harassment)

158.    Plaintiffs reincorporate and adopt the allegations in paragraphs 1 – 157 above as if fully contained herein.

159.    At all times relevant, K.G. was a student at an educational institution receiving federal funds.

160.    At all times relevant, M.G. was a student at an educational institution receiving federal funds.

161.    At all times relevant, Woodford County High School was an educational institution receiving federal funds.

162.    Defendant Board of Education of Woodford County is responsible for the acts and omissions of Woodford County High School as alleged in this case.

163.    At all times relevant, Woodford County High School was operated and managed by the Board of Education of Woodford County.

164.    The Board vests in the Principal of each of its schools, including Woodford County High School, the authority to act on the Board's behalf and to receive and investigate claims of the type of conduct described herein.

165.    K.G. was subjected to harassment based on her sex.

166.    M.G. was subjected to harassment based on her sex.

167.    K.G. was subjected to sexually explicit remarks by J.C.S. acting in his official capacity.

168.    M.G. was subjected to sexually explicit remarks by J.C.S. acting in his official capacity.

169.    K.G. was subjected to forced sexual touching by J.C.S. acting in his official capacity.

170.    M.G. was subjected to forced sexual touching by J.C.S. acting in his official capacity.

171.    The Board, through its duly authorized agents, had actual knowledge of the unlawful conduct of J.C.S. yet acted, and continues to act, with deliberate indifference to the rights of K.G. and M.G.

172.    The Board, in its failure to provide the mandatory consequences and personnel actions resulting from teacher conduct of the type alleged herein, has violated K.G. and M.G.'s rights under Title IX.

173.    The Board, in its treating of K.G. and M.G. less favorably than their male teacher in its investigation of J.C.S.'s conduct because they are female has violated K.G.'s and M.G.'s rights under Title IX.

174.    As a direct and proximate result of Defendants' acts and omissions, K.G. and M.G. have suffered and continue to suffer harm, including but not limited to humiliation, pain and suffering, reputational losses, absence from school and others.

WHEREFORE, Plaintiffs K.G. and M.G. by and through their parents and next friends Jane and John Doe hereby demand: (1) judgment in their favor and against all Defendants for violations of Title IX of the Education Amendments of 1972; (2) entry of an order awarding all actual and compensatory losses; (3) entry of an order prohibiting Defendants from engaging in further unlawful contact with K.G. and M.G.; and entry of an award of Plaintiffs' reasonable attorneys' fees and costs.

## Count II – Violations of Title IX (Retaliation)

175.    Plaintiffs reincorporate and adopt the allegations in paragraphs 1 – 157 above as if fully contained herein.

176.    At all times relevant, K.G. was a student at an educational institution receiving federal funds.

177.    At all times relevant, M.G. was a student at an educational institution receiving federal funds.

178.    At all times relevant, Woodford County High School was an educational institution receiving federal funds.

179.    Defendant Board of Education of Woodford County is responsible for the acts and omissions of Woodford County High School as alleged in this case.

180.    At all times relevant, Woodford County High School was operated and managed by the Board of Education of Woodford County.

181.    The Board vests in the Principal of each of its schools, including Woodford County High School, the authority to act on the Board's behalf and to receive and investigate claims of the type of conduct described herein.

182.    The Board has a duty to keep Plaintiffs' free from retaliation for exercising their legal rights at school.

183.    The School's insistence that Plaintiffs provide statements and produce private electronic data despite Plaintiffs' request to have their parents present was retaliatory in nature, designed to deter others from reporting sexual harassment at school.

184.    By failing to prevent the threats, harassment, and bullying by their peers, the Board has breached its duty under Title IX.

185.    By failing to mandatorily discipline J.C.S. for his harassment of J.G. and K.G., the Board has breached its duty under Title IX.

186.    K.G. was and continues to be subjected to retaliation by her peers in violation of Title IX.

187.    M.G. was and continues to be subjected to retaliation by her peers in violation of Title IX.

188.    J.C.S.'s command that K.G. "be careful" after the first report of his misconduct was retaliatory in nature.

189.    The Board through its duly authorized agents had actual and/or constructive knowledge of the retaliatory conduct of J.C.S. yet acted, and continues to act, with deliberate indifference to the rights of Plaintiffs and others seeking protection of Title IX's provisions.

190.    The Board, through its duly authorized agents had actual and/or constructive knowledge of the retaliatory conduct of Plaintiff's peers yet acted, and continues to act, with

deliberate indifference to the rights of Plaintiffs and others seeking protection of Title IX's provisions.

191.    As a direct and proximate result of Defendants' acts and omissions, K.G. and M.G. have suffered and continue to suffer harm, including but not limited to humiliation, pain and suffering, reputational losses, absence from school and others.

WHEREFORE, Plaintiffs K.G. and M.G. by and through their parents and next friends Jane and John Doe hereby demand: (1) judgment in their favor and against all Defendants for violations of Title IX of the Education Amendments of 1972; (2) entry of an order awarding all actual and compensatory losses; (3) entry of an order prohibiting Defendants from engaging in further unlawful contact with K.G. and M.G.; and entry of an award of Plaintiffs' reasonable attorneys' fees and costs.

### Count III –
### 42 U.S.C. §1983 Claims

192.    Plaintiffs reincorporate and adopt the allegations in paragraphs 1 – 157 above as if fully contained herein.

193.    Defendant J.C.S. is a "person" as defined by 42 U.S.C. §1983.

194.    Defendant Board of Education of Woodford County is a government entity and a "person" subject to liability for civil rights violations under 42 U.S.C. §1983.

195.    By virtue of Defendants' unlawful acts, Plaintiffs were deprived of the rights secured by the Fourth and Fourteenth Amendments of the U.S. Constitution.

196.    Unlawful Search and Seizure: Despite lack of reasonable suspicion that Plaintiffs' engaged in unlawful activity, Defendant Woodford County School Board, acting through its duly authorized agents and under color of law as public school officials, unreasonably and unlawfully searched the data stored on K.G.'s personal cellular device on two (2) occasions.

197.    Due Process Violations: Defendant Woodford County School Board, acting through its duly authorized agents and under color of law as public school officials, unlawfully seized and detained Plaintiffs and their personal effects without substantive or procedural due process.

198.    Equal Protection Violations: Defendant Woodford County School Board, acting through its duly authorized agents and under color of law as public school officials, deprived Plaintiffs of their right to equal protection under the law by virtue of Plaintiffs' status as female victims of a male harasser-employee.

199.    Right to Bodily Integrity: Defendants, acting through their duly authorized agents and under color of law as public school officials, deprived Plaintiffs of their right to personal security and bodily integrity while at school.

200.    As a direct and proximate result of Defendants' acts and omissions, K.G. and M.G. have suffered and continue to suffer harm, including but not limited to humiliation, pain and suffering, reputational losses, absence from school and others pecuniary and non-pecuniary losses.

WHEREFORE, Plaintiffs K.G. and M.G. by and through their parents and next friends Jane and John Doe hereby demand: (1) judgment in their favor and against all Defendants pursuant to 42 U.S.C. § 1983; (2) entry of an order awarding all actual, compensatory losses and punitive damages; (3) entry of an order prohibiting Defendants from engaging in further unlawful contact with K.G. and M.G.; (4) and entry of an award of Plaintiffs' reasonable attorneys' fees and costs.

## Count IV – Damages Under KRS 446.070

201.     Plaintiffs reincorporate and adopt the allegations in paragraphs 1 – 157 above as if fully contained herein.

202.     Plaintiff K.G. is a "person injured" as defined by KRS 446.070.

203.     Plaintiff M.G. is a "person injured" as defined by KRS 446.070.

204.     Defendants' violations of their ministerial obligations under KRS 156.095; 160.345; 158.154; 620.010; and 620.030 have caused and continue to cause Plaintiffs harm.

205.     Defendant Board of Education of Woodford County is an "offender" as defined by KRS 446.070.

206.     Defendant J.C.S. in his official capacity is an "offender" as defined by KRS 446.070.

207.     Defendant J.C.S. in his individual capacity is an "offender" as defined by KRS 446.070 for violations of the statutes identified throughout this Complaint.

208.     As a direct and proximate result of Defendants' acts and omissions, K.G. and M.G. have suffered and continue to suffer harm, including but not limited to humiliation, pain and suffering, reputational losses, absence from school and others.

WHEREFORE, Plaintiffs K.G. and M.G. by and through their parents and next friends Jane and John Doe hereby demand: (1) judgment in their favor and against all Defendants pursuant to KRS 446.070; (2) entry of an order awarding all actual and compensatory losses; (3) entry of an order prohibiting Defendants from engaging in further unlawful contact with K.G. and M.G.; (4) and entry of an award of Plaintiffs' reasonable attorneys' fees and costs.

## **Count V – Intentional Infliction of Emotional Distress**

184.    Plaintiffs reincorporate and adopt the allegations in paragraphs 1 – 157 above as if fully contained herein.

185.    Defendant J.C.S., acting in his official and individual capacity, had a duty to keep Plaintiff's safe from emotional, physical and sexual abuse at school.

186.    Defendant J.C.S. violated his duty to Plaintiffs by virtue of his prurient and unlawful comments, communications, and touching.

187.    Defendant J.C.S., by his actions, intended to cause Plaintiffs serious emotional distress.

188.    Defendant utilized his position as Choir Director to cause the harm alleged herein.

189.    Defendant J.C.S.'s conduct was extreme and outrageous.

190.    J.C.S.'s conduct was beyond all possible bounds of decency and can only be regarded as atrocious and utterly intolerable in a civilized community.

191.    Plaintiffs suffered harm, including but not limited to physical harm and serious emotional distress as a direct and proximate result of J.C.S.'s unlawful conduct.

WHEREFORE, Plaintiffs K.G. and M.G. by and through their parents and next friends Jane and John Doe hereby demand: (1) judgment in their favor and against Defendant J.C.S. for intentional infliction of emotional distress; and (2) entry of an order awarding all actual and compensatory losses.

## **Count VI – Civil Battery**

192.    Plaintiffs reincorporate and adopt the allegations in paragraphs 1 – 157 above as if fully contained herein.

193.    Defendant J.C.S., in his individual and official capacity, engaged in the unlawful touching of K.G.

194.    Defendant J.C.S., in his individual and official capacity, engaged in the unlawful touching of M.G.

195.    Defendant J.C.S. intended to touch K.G. and M.G.

196.    By his unlawful touching, K.G. and M.G. suffered and continue to suffer physical and emotional harm.

WHEREFORE, Plaintiffs K.G. and M.G. by and through their parents and next friends Jane and John Doe hereby demand: (1) judgment in their favor and against Defendant J.C.S.; and (2) entry of an order awarding all actual and compensatory losses.

### Count VII – False Imprisonment

197.    Plaintiffs reincorporate and adopt the allegations in paragraphs 1 – 157 above as if fully contained herein.

198.    Without a claim of reasonable justification, authority or privilege, Defendant J.C.S., in his individual and official capacity, deprived K.G. of her liberty without her consent and against her will when he locked her in his school office and told her he wanted to "eat her like a biscuit."

199.    Without a claim of reasonable justification, authority or privilege, Defendant, The Board, deprived K.G. and M.G. of their liberty without their consent when The Board, acting through its authorized agents, told K.G. and M.G. that they could not leave the office or call their parents until after they had written a statement and (in K.G.'s case) given up her cellular device.

200.    K.G. and M.G. suffered harm and continue to suffer harm as a result of Defendant's unlawful conduct.

WHEREFORE, Plaintiffs K.G. and M.G. by and through their parents and next friends Jane and John Doe hereby demand: (1) judgment in their favor and against all Defendants; and (2) entry of an order awarding all actual and compensatory losses.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted this 2nd day of October, 2018,

/s/ **Christina Thomas Mazaheri**
Christina Thomas Mazaheri, Esq.
CMazaheri@ForThePeople.com
Adrian Mendiondo, Esq.
AMendiondo@ForThePeople.com
Morgan & Morgan
333 W. Vine St. Suite 1200
Lexington, KY 40507
Tel: (859) 286-8369
*Counsel for Plaintiffs*