United States District Court
Eastern District of Kentucky
Central Division at Lexington

K.G. and M.G. by and through    )
their Parents and Next Friends, )
JOHN DOE and JANE DOE           )
                                )
     *PLAINTIFFS*,              )
                                )          5:18-cv-0555-JMH-MAS
v.                              )
                                )
BOARD OF EDUCATION OF WOODFORD   )
COUNTY, KENTUCKY, and J.C.S.,    )
                                )          **ORDER**
     *DEFENDANTS*.              )

                              * * *

     This matter is before the Court on three motions for summary

judgment. Plaintiffs have filed a Motion for Partial Summary

Judgment against Defendant Board of Education of Woodford County

("the Board) as to Count I, Discrimination and Harassment under

Title IX. [DE 55]. Plaintiffs also filed a Motion for Partial

Summary Judgment against Defendant J. Cooper Schrimsher as to Count

V, Intentional Infliction of Emotional Distress. [DE 67].

Defendant Board of Education of Woodford County filed a Motion for

Summary Judgment as to all counts. [DE 76]. For the reasons stated

below, Plaintiffs' two motions [DE 55 and DE 67] are denied, and

Defendant's Motion for Summary Judgment [DE 76] is denied in part

and granted in part.

I.   **FACTUAL BACKGROUND**

     This case centers around an inappropriate relationship between

a teacher and student at Woodford County High School ("WCHS"). In

2016, Defendant J. Cooper Schrimsher was hired as the choir director at WCHS. [DE 67 at ¶ 4]. Plaintiffs, K.G. and M.G., are sisters who were enrolled in many classes taught by Schrimsher and participated in several activities he facilitated. [*Id.* at ¶ 5].

K.G. claims Schrimsher began acting inappropriately toward her in 2016 during her sophomore year fall semester and that the inappropriate behavior continued until her senior year fall of 2018. [DE 76 at ¶ 51]. Specifically, K.G. asserts that Schrimsher engaged in the following inappropriate behavior: calling her "super beautiful," asking for a hug in which he grabbed her buttocks, touching her legs while saying "Wow, you have the best thighs," calling her sexy, giving her gifts, having conversations on her personal phone, repeatedly tapping her thighs and tickling her back, rubbing her feet, expressing the desire to try a vaping technique where he would blow into her mouth, grabbing her breasts while exclaiming "Wow, these are the best things I've ever felt in my life," touching her breasts while she played the piano, asking if she wanted him to expose himself, sending photos of himself via Snapchat shirtless, grabbing his crotch while telling her he really liked the pose she was striking, expressing hatred for K.G.'s boyfriend and encouraging their break up, kissing her at K.G.'s family home, kissing her three other times on school property, thrusting himself against her while aroused, following K.G. on Instagram through a "Finsta" account, writing notes to K.G.

2

expressing his love, encouraging her to go to another school so they could legally be together, asking for K.G. to be his student aide in Fall of 2018, and making comments about wanting to "throw [her] across the desk and eat [her] like a biscuit." [DE 67 at ¶¶ 7-37].

M.G. claims Schrimsher was inappropriate with her on five occasions. The first occasion occurred early in summer of 2017 when Jane Doe invited Schrimsher to her house where he performed a breathing exercise with M.G. in front of K.G., John Doe, Jane Doe, and family friends. The breathing exercise was conducted by Schrimsher placing his hands around M.G.'s waist and instructing her on how to breathe. [DE 76 at ¶¶ 65-67]. The second incident occurred around October 2017, when M.G. alleges Schrimsher called her into his office after school, asked for a hug, proceeded to hug her tighter than she was comfortable with, grabbed her buttocks, and whispered inappropriate comments. M.G. alleges incidents similar to the October 2017 incident occurred three other times. [*Id.* at ¶¶ 63-64].

While Schrimsher denies all allegations related to M.G. and several allegations related to K.G. including any physical touching, he admits to giving K.G. gifts, talking to K.G. over the phone, discussing K.G.'s boyfriend, texting K.G., and telling K.G. that if she went to another school they could be together. [DE 82 at ¶¶ 12-15]. He also admits that it was his voice on a recording

3

that K.G. secretly made in August of 2018 [*Id*. at ¶¶ 38-39] where

Schrimsher says the following highly inappropriate comments:

> Schrimsher: Understand that you're beautiful. You have
> perfect tits.
> K.G.: Oh, my God. No.
> Schrimsher: So what? So what if I said that? It's no big deal.
> K.G.: It's a big deal to me.
> Schrimsher: Okay. It might be right now. I love that pose.
> It's just –
> K.G.: Oh, my gosh. Stop.
> Schrimsher: No, I'm saying everything you do – I'm telling
> you. You can't look bad.
> K.G.: Okay. So . . .
> Schrimsher: It's not possible.
> [DE 1-2 at p. 3]
>
> K.G.: What? What did you say before that?
> Schrimsher: Best nipples ever.
> K.G.: Before that.
> Schrimsher: I really want to see them.
> K.G.: Me?
> Schrimsher: Yes. Yes, I would like to see them.
> K.G.: No.
> Schrimsher: Oh, my God, yes.
> K.G.: No.
> Schrimsher: Yes.
> K.G.: No. Gross.
> Schrimsher: I want to see your –
> K.G.: Gross. Gross. Gross. Gross.
> Schrimsher: It's not gross.
> K.G.: It is.
> Schrimsher: It's just natural.
> K.G.: It's nasty. It's not natural.
> Schrimsher: It is natural.
> K.G.: It's not natural.
> Schrimsher: It's all – everything else is man-made. So without
> it, it is just our skin.
> ***
> K.G.: I don't get naked in front of people by myself.
> Schrimsher: That's fine. But yes, I would like to see that.
> K.G.: No, you wouldn't.
> Schrimsher: Yes.
> K.G.: Please say you wouldn't. Like –
> Schrimsher: No, I'm sorry.
> K.G.: Oh, my God.

Schrimsher: No, I'm 100 percent see them like that. I would love to see it.
***
K.G.: Should you tell me that?
Schrimsher: Should I tell you that? Probably not, but I am because I'm very – I am
forward, and I want what I want. Do I – does that mean I'm going to get it? No. And I
upset by that? No. That's fine. Life is life. Life is full of disappointments.
***
Schrimsher: And, so yes, I want to see you. Yes, I, like, oh, my gosh, but am I going to?
Probably not.
K.G.: No.
Schrimsher: Exactly. So see?
K.G.: You're not.
Schrimsher: So – so I'm not holding you to that.
[DE 1-2 at p. 9]

While the *allegations* of misconduct began in the fall of 2016, the first *report* of Schrimsher's inappropriate behavior occurred in January of 2017. [DE 75 at ¶ 1]. A student peer, Nathan Goforth saw the inappropriate text messages between Schrimsher and K.G., and reported what he saw to the librarian who in turn reported the incident to school administrators. [DE 55 at ¶ 14]. Goforth claims that he told Assistant Principal Darnell and Principal Akers specific examples of the inappropriate comments in the text message like "You're so hot," "You're so beautiful, "I wish you weren't in high school," and that there were direct references to K.G.'s breasts and buttocks. [DE 57-3 at ¶¶ 11-12]. However, the Board claims Goforth only presented vague descriptions of the text messages saying they were "inappropriate" or "dangerous." [DE 75 at ¶ 2].

In response to the Goforth report, the Board "met with Schrimsher and K.G. separately" but both "K.G. and Schrimsher denied that there had been any inappropriate communications between them." [DE 76 at ¶¶ 11-14]. Specifically, Charles Flora, the school resource officer, called John Doe about Goforth's allegations. However, Plaintiffs claim Officer Flora only conveyed the "g-rated version" of what was happening because that was all he knew from Principal Akers. [DE 83 at ¶ 16]. Jane Doe was pulled aside at a basketball game by Principal Akers and Officer Flora and told that a student alleged there was inappropriate communication occurring between K.G. and Schrimsher. During the encounter, K.G.'s mom allowed Principal Akers and Officer Flora to check K.G.'s phone, but there were no text messages to view because K.G. had deleted them. [DE 75 at ¶¶ 8-14].

Additionally, after the Goforth report Assistant Principal Forgey, Assistant Principal Darnell, and Principal Akers met with Schrimsher. [DE 55 at ¶ 15]. Plaintiffs claim that at this meeting Forgey asserted that Schrimsher could not be interested "in a female student" because everyone knew that Schrimsher was "gay" and so "we know you didn't do this because you're gay" and asking Schrimsher "what can we do to support you moving forward as new teacher?" [*Id.* at ¶ 15-17]. While the Board admits that a comment was made about Schrimsher's sexual orientation by Forgey, the Board argues that it is not relevant, it was not made at this

administrative hearing, and it was brought up in a different context – addressing rumors that Schrimsher was dating a student's mother. [DE 75 at ¶¶ 16-17]. While no further investigation occurred following the meetings and Schrimsher was not written up, the Board claims no additional investigation was needed nor were disciplinary steps taken not because the Board believed Schrimsher to be gay as Plaintiffs assert, but because the concerns raised by Goforth were investigated, denied by K.G. and Schrimsher, and there was no proof of misconduct. [DE 55 at ¶¶ 18-20; DE 75 at ¶ 24].

A second report concerning K.G. and Schrimsher was made to Principal Akers by a teacher, Elizabeth Gibson, relaying an allegation from another student that Gibson considered a "red flag." [DE 55 at ¶ 22; DE 75 at ¶ 22]. While Plaintiffs allege this occurred "later that semester," the Board maintains the information was received "around the same time" as the Goforth report. [*Id.*].

In the fall of 2018, the Board approved Schrimsher's request to have K.G. as his student aide during his empty "planning" period, meaning K.G. and Schrimsher would be completely alone. In mid-August of 2018, while K.G. was alone with Schrimsher in his office, K.G. recorded Schrimsher making the sexually charged comments provided above. [DE 75 at ¶ 35]; [DE 55 at ¶ 35]; [DE 1-1 at ¶ 123].

7

On August 16th, 2018, two students heard about the recordings and reported them to Gibson who informed the social worker and administration. [DE 75 at ¶ 35]. That day, K.G. was called to the office to be questioned about the recordings. K.G. asserts that she "started bawling crying" when asked about the recordings and "asked them if [she] could have a second to, like, text my mom," however, she was told "we don't know if it's anything to worry about yet, so why don't you just go ahead and show us and then we'll call your parents." [DE 83 at ¶ 37]. K.G. shared the recordings with the Board who then had K.G. prepare a written statement and contacted her parents to come to the school. It is disputed whether law enforcement was notified by the Board. [DE 76 and 83 at ¶ 45].

After confirming the existence of the videos, Schrimsher was removed from the building. Schrimsher resigned on August 24th, 2018, following several Board meetings. [DE 55 & 75 at ¶¶ 38-40]. After the revelation of the August recording, other students came forward with complaints about Schrimsher. [*Id.* at ¶ 39]. The Kentucky Cabinet for Health and Family Services investigated the allegations and issued a letter saying, "While working as a teacher, in a position of authority, at Woodford County Public Schools Mr. Schrimsher had a responsibility for several children. Evidence was collected and multiple child interviews were conducted in which children described being touched in a sexual

8

nature and propositioned by Mr. Schrimsher." [*Id.* at ¶ 41]. While Plaintiffs claim Schrimsher was never written up, the Board disputes such indicating that the first page of Schrimsher's personnel file contains the letter from the Cabinet for Health and Family Services and correspondence from the Kentucky Department of Education acknowledging Superintendent Hawkins made a report on Schrimsher's certificate. [DE 75 at ¶¶ 40 & 44].

Plaintiffs also point to four other incidents of teacher-on-teacher sexual harassment that occurred in Woodford County. While Plaintiffs claim the Board supported rather than disciplined these teachers, the Board claims they investigated each incident and responded properly. [DE 75 & 55 at ¶ 46].

## II.   PROCEDURAL BACKGROUND

On October 2, 2018, John and Jane Doe, on behalf of their children K.G. and M.G., filed this action against the Board and Schrimsher, individually and in his official capacity. K.G. and M.G. were minor children at the time the events underlying this action took place and at the time this action was filed. [DE 1].

Based on the factual allegations described above, Plaintiffs initially brought seven (7) claims against the Board and Schrimsher: (1) sexual harassment in violation Title IX, (2) retaliation in violation of Title IX, (3) a deprivation of rights under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C.

§ 1983, (4) violation of KRS 446.070, (5) intentional infliction of emotion distress, (6) civil battery, and (7) false imprisonment.

On September 3, 2019, this Court dismissed all claims against Schrimsher in his official capacity because the claims were the same as those raised against the Board. [DE 35]. Thereafter, on July 30th, 2021, the Court granted Schrimsher summary judgment on the Title IX violations (Count I and Count II) in his individual capacity as Title IX does not permit such claims. [DE 103]. Several of the remaining claims are now addressed.

## III. DISCUSSION

### A. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" exists when "a reasonable jury could return a verdict for the non-moving party." *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 255 (1986)); *Smith v. Perkins Bd. Of Educ.*, 708 F. 3d 821, 825 (6th Cir. 2013). In the Court's analysis, "the evidence should be viewed in the light most favorable to the non-moving party." *Ahlers v. Schebil*, 188 F. 3d 365, 369 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 255).

The initial burden falls on the moving party, who must identify portions of the record establishing the absence of a genuine issue of material fact. *Chao v. Hall Holding Co.*, 285 F. 3d 415, 424 (6th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If established, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Id*. The nonmoving party will not overcome a motion for summary judgment by simply showing "some metaphysical doubt as to the material facts." *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). In other words, "the respondent must adduce more than a scintilla of evidence to overcome the motion." *Street v. J.C. Bradford & Co.*, 886 F. 2d 1472, 1479 (6th Cir. 1989). As a "mere scintilla of evidence" is insufficient, the non-movant must show the existence of "evidence on which the jury could reasonably find for the non-moving party." *Sutherland v. Mich. Dept. of Treasury*, 344 F. 3d 603, 613 (6th Cir. 2003) (citing *Anderson*, 477 U.S. at 251).

## B. **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT J. COOPER SCHRIMSHER AS TO INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

The Court first addresses Plaintiffs' Motion for Partial Summary Judgment against Schrimsher. [DE 67]. Kentucky law follows the Restatement (Second) of Torts, which holds that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes

11

severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement (Second) of Torts § 46. In the Commonwealth, the tort of Intentional Infliction of Emotional Distress [IIED] is also known as the tort of outrage. "Kentucky law recognizes no distinction between intentional infliction of emotional distress and the tort of outrage." *Penman v. Correct Care Sols.*, No. 5:18-CV-58-TBR, 2018 U.S. Dist. LEXIS 201317, at *16 (W.D. Ky. Nov. 26, 2018)(citing *Torres v. Am. Emplrs. Ins. Co.*, 151 F. App'x 402, 413 (6th Cir. 2005)).

"Kentucky considers the tort of outrage, or IIED, to be a 'gap filler.'" *Watts v. Lyon Cty. Ambulance Serv.*, 23 F. Supp. 3d 792, 813 (W.D. Ky. 2014) (citing *Farmer v. Dollar Gen. Corp.*, 2012 U.S. Dist. LEXIS 136117, at *20 (W.D. Ky. Sept. 24, 2012)). Therefore, "where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie." *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993). "This means that IIED is not ordinarily a valid cause of action if the alleged conduct also gives rise to a claim for another tort through which emotional distress damages are available." *Dahms v. Correct Care Sols., LLC,* No. 3:18-CV-63, 2019 U.S. Dist. LEXIS

173305, at *29 (W.D. Ky. Oct. 7, 2019). This is because "[t]he tort of outrage was intended to supplement the existing forms of recovery, not swallow them up." *Rigazio*, 853 S.W.2d at 299.

Nonetheless, courts have carved out an exception for when IIED can be sought contemporaneously with another tort for which emotional damages are available. *Brewer v. Hillard*, 15 S.W.3d 1, *8 (Ky. Ct. App. 1999). "Parties may overcome this general rule only in circumstances where the alleged 'actions or contact is intended only to cause extreme emotional distress in the victim.'" *Dahms*, 2019 U.S. Dist. LEXIS 173305, at *29 (quoting *Brewer*, 15 S.W. 3d at *7). In other words, outrage "is still a permissible claim" even when more traditional torts are available if it was the defendant's sole intention to cause extreme emotional distress. *Grise v. Allen,* No. 5:11-195-KKC, 2016 U.S. Dist. LEXIS 42182, at *27 (E.D. Ky. Mar. 30, 2016). The exception applies only on "rare occasions." *Holliday v. Leigh*, No. 2:17-cv-113 (WOB-CJS), 2020 U.S. Dist. LEXIS 103965, at *33 (E.D. Ky. June 15, 2020). In factually similar cases, courts have not permitted outrage claims to remain where the defendant's primary purpose was "sexual gratification."[1]

---

[1] *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993)(affirming the dismissal of the tort of outrage where there "is no evidence from which it could be inferred that the appellee Griffith intended only to invade Donald's interest in freedom from emotional distress" but rather "intent plainly was his own sexual gratification" and explaining that "recovery for emotional distress caused by the assault or battery would be allowable as an element of damages based upon those torts"); *Jones v. Binion,* No. 08-84-DLB-

Plaintiffs brought an IIED claim against Schrimsher based on his "prurient and unlawful comments, communications, and touching." [DE 1 at ¶ 186]. However, because Plaintiffs allege other torts like civil battery and false imprisonment where emotional damages are available, Plaintiffs' IIED claim will not be allowed to stand alone unless Plaintiffs prove that Defendant's actions were intended only to cause extreme emotional distress and not primarily for sexual gratification.

Plaintiffs have failed to present any evidence or make any argument on the matter. In their Reply [DE 85], Plaintiffs do not address the issue though it was raised in Schrimsher's Response. [DE 82]. Therefore, it remains a genuine issue of material fact as to whether Schrimsher's actions were intended solely to inflict extreme emotional distress or primarily focused on sexual gratification. Plus, that it appears Plaintiffs still intend to pursue other torts, makes summary judgment inappropriate.

---

EBA, 2011 U.S. Dist. LEXIS 41413, at *27 (E.D. Ky. Apr. 15, 2011)(granting motion for summary judgment on the outrage claim where "the record does not suggest that Hollingsworth's assaults were intended for anything but his own sexual gratification" and the plaintiff may be awarded damages for emotional distress under the assault and battery claims); *Doe v. Suroor*, No. 3:05CV-728-H, 2007 U.S. Dist. LEXIS 41343, at *3 (W.D. Ky. June 6, 2007) (granting motion to dismiss on the outrage claim because the plaintiff was also alleging physical sexual assault for which emotional distress damages were available and the physical assault was not intended solely to indict extreme emotional distress but rather "sexual gratification or sexual dominance was the primary purpose at work"); *Brewer v. Hillard*, 15 S.W.3d 1, *8 (Ky. Ct. App. 1999) (finding IIED claim *was available* to the plaintiff because defendant's "intent was to harass or intimidate by sexual embarrassment, rather than to merely touch improperly or threaten improper touch" and the defendant directly "testified he did not take any of the actions for sexual gratification")

Moreover, even if the IIED claim could stand alone, Plaintiffs would still not be entitled to summary judgment as they have not met their burden of proving all the elements of the claim. To prove IIED, Plaintiff must establish the following: "(1) the wrongdoer's conduct must be intentional or reckless; (2) the conduct must be outrageous and intolerable in that it offends the generally accepted standards of decency and morality; (3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress must be severe." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky.2004); *Loftus v. Nazari*, 21 F. Supp. 3d 849, 856 (E.D. Ky. 2014). The record remains full of disputed facts relevant to whether the actions pass the "high threshold for IIED claims." *Watts v. Lyon Cty. Ambulance Serv.*, 23 F. Supp. 3d 792, 814 (W.D. Ky. 2014)(granting summary judgment for the defendants because the plaintiff failed to show "as a matter of law" that the defendant's conduct qualified as outrageous nor offered any proof of emotional distress). Viewing the record in the light most favorable to the non-moving party and acknowledging that summary judgment should be granted only if it appears impossible that a jury would find for the non-moving party, Plaintiffs have not met their burden.

For example, Plaintiffs have failed to establish the fourth element, severe emotional distress. To prove severe emotional distress, a plaintiff must demonstrate distress that is

15

"substantially more than mere sorrow." *Gilbert v. Barkes*, 987 S.W.2d 772, 777 (Ky. 1999). "The law intervenes only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Smith v. Lewis*, No. 2018-CA-000180-MR, 2019 Ky. App. Unpub. LEXIS 903, at *18 (Ct. App. July 5, 2019).

"A plaintiff claiming emotional distress damages must present expert medical or scientific proof to support the claimed injury or impairment." *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 544 (Ky. Ct. App. 2013) (citing *Osborne*, 399 S.W.3d at 17-18) (upholding summary judgment for the defendant on the IIED claim because the plaintiffs "presented only their own statements that its members suffered severe emotional distress" and they were "required to present some affirmative evidence of severe emotional distress to support the claim"); *Mitchell v. Mike*, Civil Action No. 5:14-301-DCR, 2015 U.S. Dist. LEXIS 147183, at *17-18 (E.D. Ky. Oct. 30, 2015)("even if the plaintiffs could properly plead outrage, they could not establish the elements because they have no expert or scientific evidence of serious or severe emotional distress, as explained above"); *Littrell v. Bosse*, 581 S.W.3d 584, 588 (Ky. Ct. App. 2019)(holding that "Littrell's proof that he was willing to testify as to his emotional distress is insufficient to satisfy" the element of severe emotional distress).

Plaintiffs have not provided any scientific proof of emotional distress. Plaintiffs claim severe emotional distress is

evidenced by K.G. wearing baggy clothes to school to protect herself, the "sense of fear embarrassment and shame" that was instilled in Plaintiffs, Defendant befriending Plaintiffs' parents so they felt they had "nowhere to turn for help," worry, students making up rumors, students calling them "whores" and that they "wanted it", K.G. losing 23 pounds in less than a year, struggling to attend school, K.G. not being able to trust people outside of the family, K.G. having trouble with male authority figures, K.G. turning down a job because she was afraid Defendant was going to show up, having a strong emotional reaction whenever they see a car that looks like Defendant's, M.G. not liking to be touched her hugged, and M.G. no longer feeling comfortable talking to her school's guidance counselor. [DE 67 at p. 21]. While the alleged damages experienced by Plaintiffs are distressful, Plaintiffs have failed to provide the appropriate medical evidence at this stage for the Court to find it undisputed that they suffered severe emotional distress. That Defendant in his Answer admitted to K.G. and M.G. suffering "irreparable and lasting injuries" does not equate to the element of severe emotional distress being satisfied. The terminology is not interchangeable.

Plaintiffs confuse the bearer of the burden asserting that they should be granted summary judgment because Defendant "has not and cannot present any evidence that the intentional, prolonged pervasive sexual abuse and harassment visited by him upon

Plaintiffs did not result - both directly and indirectly – in severe and lasting emotional distress." [DE 67 at p. 23]. Yet, at the summary judgment stage, the movant must first meet their burden before the non-movant is required to respond. As shown above, Plaintiffs have failed to come forward with evidence sufficient to establish severe emotional distress, a required element in an IIED claim. There is no presumption of severe emotional distress that Schrimsher must overcome.

It should also be noted that Plaintiffs have pointed to no case where summary judgment on an IIED claim was granted for the plaintiffs. Instead, the cases utilized by Plaintiffs for support simply deny *defendant's* motion for summary judgment after viewing the record in the light most favorable to the plaintiff or uphold jury verdicts finding IIED. *Brewer v. Hillard*, 15 S.W.3d 1, 7 (Ky. Ct. App. 1999) (upholding the trial court's denial of summary judgment for the defendants on the IIED claim); *Wilson v. Lowe's Home Ctr.*, 75 S.W.3d 229, 238 (Ky. Ct. App. 2001) (concluding the trial court erred in holding the plaintiff's IIED claim was not sufficient to survive the summary judgment motion); *Smith v. Lewis*, No. 2018-CA-000180-MR, 2019 Ky. App. Unpub. LEXIS 903, at *21 (Ct. App. July 5, 2019)(upholding jury verdict finding IIED).

The absence of a case where plaintiffs were granted summary judgment on an IIED claim does not automatically bar this Court. Nonetheless, summary judgment cannot be granted because genuine

issues of fact remain, and Plaintiffs have not convinced the Court that it is impossible for the nonmoving party to produce evidence at trial showing that an element was not met. While Defendant's alleged actions are inappropriate and repulsive, it is for the trier of fact to deduce the disputed evidence to determine whether the conduct was intentional, outrageous, and the cause of severe emotional distress.

## C. DEFENDANT BOARD OF EDUCATION OF WOODFORD COUNTY'S MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS

The Court next addresses the Board's Motion for Summary Judgment as to all counts. For sake of clarity, each claim is addressed individually.

## COUNT I: VIOLATIONS OF TITLE IX SEXUAL DISCRIMINATION AND HARASSMENT

Title IX provides that no "person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A private right of action is available to plaintiffs if they can show (1) the existence of sexual harassment or a sexually hostile environment, (2) a school official with sufficient authority had actual notice that the teacher posed a substantial risk of sexual abuse to students, and (3) the Board was deliberately indifferent to that substantial

risk. *Williams v. Paint Valley Local Sch. Dist.,* 400 F.3d 360, 366 (6th Cir. 2005); *Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp. 2d 679, 684 (W.D. Ky. 2003).

As to the first element, it is undisputed that an appropriate person was involved in early 2017 following the Goforth report. An appropriate person is "an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290 (1998). Kentucky courts have found both principals and superintendents to be "appropriate official[s]." *Thorpe v. Breathitt Cnty. Bd. of Educ.,* 8 F.Supp.3d 932, 944 (E.D. Ky. 2014) (citing Ky. Rev. Stat. Ann. § 160.370; Ky. Rev. Stat. Ann. § 160.345; *see Doe v. Farmer,* No. 3:06-0202, 2009 U.S. Dist. LEXIS 104152, at *25 (M.D. Tenn. Nov. 9, 2009). In January of 2017, Principal Akers and Assistant Principal Darnell were involved. Case law makes it clear that they are appropriate persons with authority to take corrective actions.

A key dispute among the parties centers around the second element, notice. Defendants assert there was no actual notice until the recordings in August of 2018, at which time the Board responded appropriately. However, Plaintiffs claim actual notice occurred in January of 2017 with the Goforth report. Actual notice requires a plaintiff to show that an (1) appropriate person (2) had actual knowledge of a substantial risk of sexual assault or "notice of facts that indicate the likelihood of discrimination," (3) and

responded with deliberate indifference. *Thorpe*, 8 F. Supp. 3d at 944.

In *Swafford*, the court found there was no actual knowledge when a concerned mother called the principal on a Friday alerting him to a party being hosted by the school janitor where underage high school students would be present. *K.D. v. Swafford*, 353 F. Supp. 3d 606, 610 (E.D. Ky. 2018). The principal did not attempt to stop the party, but planned to meet with the mother on Monday. At the party a student was sexually assaulted. *Id*. The court found a tip alerting the principal that students may be at a janitor's party did not equate to the principal having actual knowledge that sexual abuse was going to occur. "The undisputed evidence in this case shows that, at the time, [the principal] was not aware of any *confirmed act* of *sexual harassment* by [the janitor]." *Id*. at 617.

The factual differences between this case and *Swafford*, requires the Court to come to a different conclusion. This Court agrees it would be unreasonable to impute actual knowledge of sexual abuse based off a phone call concerning a party that has yet to occur. However, Goforth alleged he saw text messages already in existence that indicated a currently ongoing inappropriate relationship between a student and teacher. A report that something might occur in the future likely merits a different response than a report that something has and currently is occurring.

In another case involving an inappropriate relationship with a teacher and a student, the court denied summary judgment on the Title IX claim because there remained a genuine issue of material fact for whether the principal and superintendent had actual knowledge. *Thorpe*, 8 F. Supp. 3d at 947. The student, D.T., alleged that in late 2010 and early 2011 the defendant teacher engaged in the following: "grossly inappropriate touchings, flirtations, email transmittal of pornographic material depicting his genitalia and constant text messaging inducing her to engage in sexual intercourse." *Id.* at 936. When D.T.'s friend accessed the inappropriate messages and showed another teacher, the superintendent met with the defendant teacher who resigned that day. *Id.* D.T. alleged thar prior to her abuse, the superintendent and principal knew that the defendant teacher had sexually harassed another female student, A.R., at the school in early 2010.

That prior year A.R.'s parents discovered text messages between the defendant teacher and A.R., specifically 168 text messages exchanged in a short period of time and even throughout the night, though the content of those messages were not revealed. *Id.* at 937. When the concerned parents found out the teacher was messaging their daughter, they met with the principal and superintendent who called the teacher's behavior sick and suspended him for 10 days. However, the teacher was rehired the next school year, which is when D.T. was subject to the sexual

abuse. *Id.* "Based on these facts" the court determined that the plaintiff had "presented enough evidence for a reasonable jury to find that the [superintendent] and [principal] had actual knowledge of a substantial risk that [the teacher] would abuse female students." *Id.* at 945.

While in the present case there was no previous student being abused, there was a similar warning about inappropriate text messages from a teacher to a student. Here the report just involved the same student currently bringing the lawsuit. Additionally, instead of a student notifying administrators about the messages as Goforth did, it was A.R.'s parents complaining about the text messages. Nonetheless, these minor differences do not change the result – that a jury considering the report from Goforth and then from another teacher might conclude that the Board had actual knowledge that Schrimsher posed a substantial risk. While it weighs against Plaintiffs that K.G. denied the allegations when asked in 2017 and deleted the messages, the jury could still conclude given the weight of other evidence that the Board should have known that K.G., a young impressionable student potentially being sexually abused, might deny truthful claims.

While *Gebser* makes clear that "actual notice requires more than a simple report of inappropriate conduct by a teacher...the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible

report of sexual abuse from the plaintiff-student." *Doe v. School Admin. Dist. No*. 19, 66 F. Supp. 2d 57, 62 (D. Me. 1999). Put more precisely:

> "The *Gebser* notice standard does not require that the offending instructor actually commit previous acts of harassment against the plaintiff-student and that the plaintiff-student complain before the institution may be held liable for the instructor's subsequent repeated misconduct under Title IX. Actual knowledge of intentional discrimination and actual knowledge of the actual plaintiff's experiences are two different things."

*Johnson v. Galen Health Insts., Inc.*, 267 F. Supp. 2d 679, 688 (W.D. Ky. 2003). Nonetheless, for there to be actual notice the report must be sufficiently detailed and of the same nature of the actual harassment. "[T]he case law is clear that only reliable and unambiguous reports have been deemed sufficient to provide actual knowledge...Inappropriate behavior of a different nature than the eventual harassment cannot give rise to actual knowledge for Title IX purposes." *Doe v. Bradshaw*, 203 F. Supp. 3d 168, 185 (D. Mass. 2016); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998) ("That information, however, consisted of a complaint from parents of other students charging only that Waldrop had made inappropriate comments during class, which was plainly insufficient to alert the principal to the possibility that Waldrop was involved in a sexual relationship with a student.").

Because the content and specificity of Goforth's complaint to the Board is factually disputed, summary judgment is inappropriate. While Plaintiffs point to Goforth's written statement where Goforth claims he told Principal Akers "exactly what [he] had seen on [K.G.]'s cellphone" which included "direct references to [K.G.]'s breasts and buttocks" and messages including "You're so hot," "you're so beautiful," and "I wish you weren't in high school," the Board asserts that Goforth's report did not give details of the messages, but was instead a broad warning about inappropriate texting. [DE 57-3 at ¶ 11-15]. This factual dispute rests at the heart of the notice inquiry. For if the messages did not detail the sexual nature of the relationship, then it perhaps was not enough to alert school officials as a broad message may be too different in nature according to case law. Similarly, while the second report by Gibson weighs in favor of notice, factual disputes remain regarding when Gibson's report occurred. Therefore, whether the Board had actual knowledge, the second element, in a Title IX sexual discrimination claim is uncertain.

The third element in Title IX discrimination claims, that the Board responded with deliberate indifference, also does not merit summary judgment at this time. To show deliberate indifference, a plaintiff must show that defendants "intentionally acted in clear violation of Title IX by remaining deliberately indifferent to

known acts of harassment." *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000)(emphasis added). Therefore, the knowledge and deliberate indifference element overlap. To show deliberate indifference, Plaintiffs must show that the Board's response was "clearly unreasonable in light of known circumstances." *Id.*

In *Swafford* in addition to finding the principal did not have actual knowledge, the court found he did not respond indifferently because he actively made plans to question the janitor about the report and to meet with the concerned mother on Monday "before he even knew of [the student's] assault*." Swafford*, 353 F. Supp. 3d at 617. In contrast, the *Thorpe* court, taking plaintiff's claims as true, denied summary judgment because a reasonable jury could conclude that the principal and superintendent "knew that [the teacher] posed a substantial risk of harassing other girls in the future," therefore the jury could also find that "their actions—suspension of [the teacher] for ten days without pay and a failed attempt to investigate the situation—were clearly unreasonable." *Thorpe*, 8 F. Supp. 3d at 946. While the principal asked for the text messages between the teacher and the student, they were never produced, and the principal never followed up.

This case falls somewhere in the middle of *Swafford* and *Thorpe*. While it was "reasonable in light of the circumstances," though certainly negligent, for the principal in *Swafford* to meet

26

with the concerned mother and janitor on Monday and not to stop the party, here the undisputed facts do not obviously indicate whether the Board's actions were clearly reasonable. Factual questions remain regarding the "known circumstances," specifically the details of the two reports. Even though the Board confronted the parents, K.G., and Schrimsher, they never searched Schrimsher's phone, sought more information from Goforth or Gibson, pulled K.G. from the classroom, and even went on to allow K.G. to be Schrimsher's personal aide. Though perhaps the Board did not act unreasonably since K.G. denied Goforth's allegations. Plaintiffs have presented enough evidence to make deliberate indifference genuinely disputed and one for a jury to decide.

In conclusion summary judgment is inappropriate because it is possible, though currently genuinely factually disputed, that the Board had actual notice in January of 2017. And if there was actual notice, a genuine issue of material fact remains regarding whether the conduct of the Board from January of 2017 to the investigation in August of 2018 constituted deliberate indifference.

<u>COUNT II: RETALIATION UNDER TITLE IX</u>

Plaintiffs' second claim, that the Board retaliated against Plaintiffs following their complaint, also falls under Title IX. "Although Title IX does not explicitly provide a cause of action for retaliation, the Supreme Court has interpreted Title IX's prohibition of sexual discrimination to include retaliation."

27

*Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 615 (E.D. Pa. 2014) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005)). A plaintiff, therefore, may use Title IX "when a funding recipient retaliates against a person because he complains of sex discrimination" as "this constitutes intentional discrimination on the basis of sex." *Jackson*, 544 U.S. 167 at 174. "[A] Title IX retaliation claim can be established either through direct evidence of retaliation or circumstantial evidence that would support an inference of retaliation." *Noakes v. Case W. Res. Univ.*, No. 1:21-cv-1776, 2021 U.S. Dist. LEXIS 184995, at *19 (N.D. Ohio Sep. 28, 2021)(citing *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 755 (M.D. Tenn. 2019).

"Direct evidence is evidence that, if believed, *requires* the conclusion that retaliatory animus played a part in the challenged decision." *Doe v. Rutherford Cty.*, No. 3:13-cv-00328, 2014 U.S. Dist. LEXIS 114477, at *51 (M.D. Tenn. Aug. 18, 2014)(citing *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 383 (6th Cir. 2002))(emphasis added). No inference is needed to show that engagement in the protected activity was the reason for the adverse action:

> A plaintiff relying on direct evidence faces a heavy burden. Direct evidence of retaliation must demonstrate—"without inference or presumption"—a "retaliatory attitude correlating to the ... retaliation complained of by the employee." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997)

28

(collecting cases). That is, the evidence must (if believed) prove—by mere virtue of its existence—that an employer took material adverse action against an employee because of that employee's protected activities. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) ("One example of direct evidence [of discrimination] would be a scrap of paper saying, 'Fire Rollins—she is too old.'"). "Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." *Merritt*, 120 F.3d at 1189 (citations omitted).

*Marsey v. State Bd. of Admin. of Fla.,* 29 Fla. L. Weekly Fed. D 47, at *4 (U.S. N.D. Fla. 2021).

Plaintiffs claim they engaged in the following protected activities: providing school officials and law enforcement with written witness statements in August 2018, K.G. showing school officials two recording of on-campus misconduct, and Plaintiffs asking the Woodford County Family Court for a Protective Order. [DE 83 at p. 23]. As proof of retaliation, Plaintiffs assert the following: the school's guidance counselor denying K.G. the benefit of school counseling services because K.G. needed to "work on not getting teachers fired," being "subjected to continuous, pervasive harassment at school by their peers", and being called whores and told they "wanted" what happened to them. [*Id.*].

Even if the Court accepts that Plaintiffs' proposed protective actions qualify as such, that "evidence" does not "by its mere existence" prove that the Board was retaliating, nor

require the conclusion that retaliatory animus was at play. First, as expanded below, no retaliatory action was conducted by the Board itself.

Second, assuming the Board can be held liable for the actions of the peers and counselor, Plaintiffs have failed to meet their high burden of showing direct evidence as the actions are subject to more than one interpretation. The peer bullying may have been occurring not because Plaintiffs engaged in a protected activity, but because Plaintiffs were victims of a teacher's sexual abuse. Even assuming the counselor said she stopped services because K.G. needed to "work on not getting teachers fired," that statement does not *require* a conclusion that the termination of counseling services, services that started *after* K.G. came forward with the recordings, was due to K.G. pursuing her claim. *Fuhr v. Hazel Park Sch. Dist.*, 710 F. 3d 668, 673 (6th Cir. 2013)(finding no direct retaliation even where teacher was dismissed following her successful Title IX suit and evidence was presented showing the principal saying "this is a good ols boys network…they are doing this to you to get back at you for winning the lawsuit"). Plaintiffs have put forward no direct evidence.

For indirect retaliation cases, a plaintiff must show "(1) [s]he engaged in protected activity, (2) [the funding recipient] knew of the protected activity, (3) [s]he suffered an adverse school-related action, and (4) a causal connection exists between

the protected activity and the adverse action." *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020)(citing *Gordon v. Traverse City Area Pub. Sch.*, 686 Fed. Appx. 315, 320 (6th Cir. 2017)).

The Board first asserts that none of plaintiffs' actions prior to filing the lawsuit constituted a protected activity because it was not Plaintiffs themselves that initially came forward with the complaint. [DE 76 at p. 26]. If read literally, certain case law may support the notion that a plaintiff is only allowed to use Title IX's retaliation feature if he is the one that brings the complaint. "[A] recipient of federal funds violates Title IX when it 'retaliates against a person *because* he complains of sex discrimination.'" *Schrader v. Emporia State Univ.*, No. 19-2387-DDC-TJJ, 2021 U.S. Dist. LEXIS 179378, at *58 (D. Kan. Sep. 21, 2021) (citing *Jackson*, 544 U.S. at 174). However, a broader interpretation is also found, where a protected activity is described as "actively complaining of *or opposing alleged discrimination* on the basis of sex under Title IX." *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 757 (M.D. Tenn. 2019)(emphasis added).

The broader interpretation aligns more with the purpose of Title IX. It is likely that the *victim* participating in an investigation of sexual discrimination by providing statements and recordings qualifies as "opposing alleged discrimination" even if the plaintiff was not the one to initially complain about the sex discrimination. To hold otherwise would discourage victims, who

were too scared to complain themselves in the first place, from helping in an active investigation for fear of retaliation. However, the Court need not declare definitively whether this is a protected activity because even if it were, the Title IX retaliation claim must fail because Plaintiffs have not suffered an adverse school-related action, the third element.

The alleged adverse actions were performed by the counselor and peers, neither of which qualify for a retaliation claim. Case law is clear that actions by the guidance counselor cannot qualify as an adverse action for purposes of a retaliation claim. *M.D. ex rel. Deweese v. Bowling Green Ind. Sch. Dist.*, 709 F. App'x 775, 779 (6th Cir. 2017)(recognizing that a plaintiff raising a Title IX retaliation claim cannot use agency principles to impute liability to a funding recipient for the misconduct of its employees). A "recipient of federal funds may be liable in damages under Title IX only for its own misconduct," therefore a plaintiff cannot use "agency principles to impute liability to [a school] for the misconduct of its teachers." *Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 640 (1999); *M.D. v. Bowling Green Indep. Sch. Dist.*, 709 F. App'x 775, 779 (6th Cir. 2017)(rejecting plaintiffs argument that the coach's actions could be imputed to the school district on an agency theory). Therefore, the Board cannot be held liable for retaliation of a guidance counselor under an agency theory.

The Board also cannot be held liable for retaliation on the theory that the Board was deliberately indifferent to the counselor's actions. First, it is uncertain whether the deliberate indifference framework applies to retaliation claims as it does in Title IX discrimination claims. *Bowling Green Indep. Sch. Dist.*, 709 F. App'x at 779; *Bose*, 947 F.3d at 993 (6th Cir. 2020)("And, for that matter, is deliberate indifference to retaliation even actionable under Title IX?"). But even if the analysis did apply, Plaintiffs have offered no evidence that the Board's response to the counselor was "clearly unreasonable in light of the known circumstances." That Plaintiffs voluntarily stopped utilizing the counselor because of a disagreement with how students were being disciplined, does not amount to deliberate indifference as the school never denied service and was attempting to punish students. *C.D. v. Career Tech. Ctr.*, No. 3:20-0088, 2020 U.S. Dist. LEXIS 43186, at *41 (M.D. Pa. Mar. 11, 2020)("the failure of defendants to offer or provide plaintiff with any counseling or other services after the ChildLine Report and Humphrey's removal from CTC does not amount to deliberate indifference and thus, cannot serve as a materially adverse action with respect to plaintiff's retaliation claim").

The student conduct, like that of the counselor, also cannot qualify as an adverse action. In *Doe v. Centerville*, the plaintiff alleged a retaliation claim partially based off "peer harassment

33

at school" after she made the report. *Doe v. Centreville Pub. Sch.,* No. 1:17-cv-317, 2019 U.S. Dist. LEXIS 234091, at *35 (W.D. Mich. Apr. 29, 2019). The school "provided Doe a place to go when her anxiety was too much and permitted her to go home or stay home as needed...spoke with each student named by Doe who spoke to her in a harassing manner." *Id.* The court found that the school's "response was reasonable and not deliberately indifferent," even if it was not the exact response the plaintiff desired. *Id.*

> Although Doe might have wanted particular students to be punished, CPS's initial response to talk with the identified students worked to end the harassment by those students. CPS might have done more to generally address the student body. This Court, however, will not second guess the school's decisions with the benefit of hindsight.

*Id.* at *35-36. The court granted the school summary judgment.

Like the student plaintiff in *Centerville*, the Plaintiffs allege that after filing the lawsuit they were being bullied and harassed by other students. Particularly, K.G. says:

> I was being harassed a lot and bullied a lot and there were several occasions in school that I was being targeted and talked about, and I didn't know what to -- what to do...I don't -- I discontinued going to the guidance office if anything was happening because I would go and tell them, oh, well this person told me that I needed to work on not getting teachers fired and nothing -- nothing was done about it. They'd bring them in to the office. They sit them down. They're like, "Well, you really shouldn't say this." Then they send them on their – on their way.

[DE 67 at ¶ 120]. K.G.'s own testimony reveals that the Board *did* take action against students by bringing them into the office and telling them to stop. This is not evidence of deliberate indifference. While Plaintiffs may have wished the school would have punished the students differently, this Court follows the lead of *Centerville* and refuses to second guess the school's disciplinary decisions with the benefits of hindsight.

In sum, Plaintiffs cannot meet the heavy burden of proving direct retaliation. Plaintiffs additionally cannot show indirect retaliation as they failed to suffer an adverse-school related action.

## COUNT III: § 1983 CLAIMS INCLUDING A VIOLATION OF THE FOURTH AMENDMENT, DUE PROCESS, EQUAL PROTECTION, AND RIGHT TO BODILY INTEGRITY

Plaintiffs allege several violations in their 42 U.S.C. § 1983 claim. "A plaintiff may assert a § 1983 claim against a local government entity, such as a county school board." *Id.* However, local government entities cannot be found liable based on *respondeat superior* liability but must only be accountable based on their own conduct. *Doe v. Claiborne County*, 103 F.3d 495, 505–06 (6th Cir.1996). "Courts use a two-pronged analysis to evaluate such claims: (1) whether a deprivation of a constitutional right has been asserted; and (2) whether the school board is responsible for the alleged violation." *Clark Cty. Bd. of Educ.*, 439 F. Supp.

3d at 912 (citing *Claiborne Cty.*, 103 F.3d at 507). The Board's motion for summary judgment on all § 1983 claims is granted because neither prong can be met.

First, there must have been a constitutional violation. *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir.1999)("In order for plaintiffs to prevail on their § 1983 claim against...the [school] Board, they must establish that the [school's] official policy or custom caused the alleged constitutional violation. However, because there is no constitutional violation...no further analysis is warranted."). As described in more detail below, there was no violation of the Fourth Amendment, Equal Protection, or Bodily Integrity.

Second, even assuming there was a constitutional violation, Plaintiffs have failed to show how the Board was responsible for the violation. "The second prong of the municipal liability analysis is not satisfied when a claim proceeds on a theory of *respondeat superior*, and a plaintiff must instead allege that the school board itself is the wrongdoer." *Claiborne Cty.*, 103 F.3d at 507; *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978)). A school board "cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Claiborne Cty.*, 103 F.3d at 507. Since there is no official policy

36

in execution, Plaintiffs must establish a custom, which is "so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691.

Plaintiffs have failed to put forward any facts indicating that the Board had a custom of violating students' Fourth Amendment rights or the Equal Protection Clause. There is no accusation nor facts plead that such behavior has occurred previously. As for the bodily integrity claim, Plaintiffs propose that previous incidents of sexual harassment by teachers created a custom of deliberate indifference because the Board continuously refused to act. However, this claim must also fail because Plaintiffs are incapable of showing that a custom of inaction was in place.

"The threshold for liability based on inaction as a supervisor under Section 1983 is extremely high." *Thorpe*, 8 F. Supp. 3d at 942; *Swafford*, 353 F. Supp. 3d at 612 (dismissing § 1983 bodily integrity claim because the plaintiffs did not establish there was a custom of failing to prevent sexual abuse because the previous five employees of the school district who had been accused of sexual misconduct had "appropriate corrective measures" taken against them); *Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 675 (E.D. Pa. 2017) ("the fatal flaw in Plaintiffs' failure-to-investigate theory of Monell liability is that they have not shown that Jordan's conduct, whatever it may have been, was the result of a policy or custom...Without a policy or custom on which to

37

base municipal liability, Plaintiffs' claim is, in the final analysis, an attempt to bootstrap District liability based on the mistakes of its administrators…").

Specifically, the burden of proving a custom of inaction in bodily integrity claims is steep. In a 2012 case in this district, while the court denied summary judgment as discovery had yet to be completed, the court emphasized that succeeding on a bodily integrity claim for inaction is an "uphill climb." The court stressed that the evidence that had been put forward thus far, "at least five incidents of inappropriate sexual behavior between teachers and students in Bell Court schools between 2004 and 2012...might not be enough to establish a genuine issue of material fact about whether the Board had an official policy or custom of permitting sexual abuse." *C.K. v. Bell Cty. Bd. of Educ.*, 865 F. Supp. 2d 795, 799 (E.D. Ky. 2012).

The *Claiborne* court granted summary judgment on the bodily integrity claim because Doe failed to show that the Board had a custom of deliberate indifference. *Claiborne Cty.*, 103 F.3d at 509. While the Board "might have been recklessly passive in the performance of their duties," the plaintiff did not show how the board's failure to act "was the direct result of a custom." Because Doe failed to "present sufficient evidence to establish the existence of a policy of inaction," the court declined to express a view concerning whether the inaction "amounted to deliberate

38

indifference" as "the finding of a custom or policy is the initial determination to be made in any municipal liability claim." *Id.*

Like *Claiborne,* here Plaintiffs have failed to present any evidence establishing that there is a custom of inaction in place. Having not met this threshold issue, the Court does not even need to address whether the Board acted with deliberate indifference. Even if Plaintiffs attempted to argue there was a policy of inaction in place based upon the four previous district incidents involving sexual misconduct, their argument would fail because the Board has shown action did occur, even if the Board's response was not perfect. [DE 75 & 55 at ¶ 46].

In conclusion, Plaintiffs are unable to show the second element of a § 1983 claim, that the Board was responsible for the constitutional violation because *respondeat superior* liability is not available and Plaintiffs have failed to establish any custom of inaction. Nonetheless, Plaintiffs are also unable to prove the first element, that a constitutional violation took place, as described below.

1. <u>Search</u>

K.G. claims she was subject to an unlawful search when "authorized agents" of the Board "unreasonably and unlawfully searched the data stored on K.G.'s personal cellular device on two (2) occasions." [DE 1 at ¶ 196]. The Fourth Amendment grants "[t]he right of the people to be secure in their persons, houses, papers,

and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourteenth Amendment grants the right to be protected against unreasonable search and seizures by state officers, including school officials. *See New Jersey v. T.L.O.*, 469 U.S. 325, 334–37 (1985).

The "touchstone" of constitutionality of a search is reasonableness. *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 828–29 (2002). The analysis for reasonability in school is different than in the criminal context. The "reasonableness inquiry cannot disregard the schools custodial and tutelary responsibility for children," *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995).

The Supreme Court has provided a two-pronged test to determine whether the search of a student is reasonable: (1) the search must be justified at its inception and (2) the search must be reasonable in its scope. *T.L.O.*, 469 U.S. at 341. "A search by a school official will generally be justified at its inception when there are reasonable grounds for suspecting that the search will produce evidence that the student has violated or is violating either the law or school rules, or is in imminent danger of injury on school premises." *Sims v. Bracken Cty. Sch. Dist.*, No. 10-33-DLB, 2010 U.S. Dist. LEXIS 110822, at *19 (E.D. Ky. Oct. 18, 2010). A search is considered reasonable in scope "when the measures adopted are reasonably related to the objectives of the search and not

excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342.

Courts have held that a search of a student's cellphone is justified at its inception when there is a threat to student safety. *Simpson, Next Friend of J.S. v. Tri-Valley Community Unit School District No.* 3, 470 F. Supp. 3d 863, 383 Ed. Law Rep. 866 (C.D. Ill. 2020)(holding no Fourth Amendment violation for warrantless search where principal had reasonable suspicion of student-on-student bullying); *Jackson v. McCurry*, 303 F. Supp. 3d 1367, 355 Ed. Law Rep. 403 (M.D. Ga. 2017) (holding no Fourth Amendment violation for searching text messages of student was allegedly sending harassing messages to peers).

The Board was justified in initiating the search both times as the searches were in response to allegations that a teacher was having an inappropriate relationship with a student, causing a potential threat to K.G. and other student's safety. The first search at the basketball game came after receiving Goforth's complaint. The second search occurred after the Board received reports that K.G. had recorded content on her phone of Schrimsher behaving in a sexually inappropriate manner. If both reports proved true, then students were in danger of a potential sexual predator.

Further, the search was reasonable in its scope. First, Goforth claimed that he became aware of the inappropriate relationship after seeing messages from Schrimsher to K.G. Therefore, the

logical approach for the Board to take to inquire further would be to access those messages, which they attempted to do on the phone. When they did not find anything, they stopped. Searching a phone for text messages related to a tip concerning that student and her texts, is "reasonably related to the objective." Further, they even asked K.G.'s mother for permission before the inquiry. With permission, the presence of K.G.'s mother, and stopping the search when nothing was found, the search was appropriate under the circumstances and "not excessively intrusive."

The second search was also reasonable in its scope even assuming K.G.'s version where she requested to call her parents before playing the audio. While it may be best practice to ensure that a student has access to their parents when requested, the school did not act unreasonably by asking another time to hear the recordings, especially considering the gravity of the situation. K.G.'s parents were contacted soon after. Based on the facts before the Court, there is no possibility in which Plaintiffs can prove a violation of the Fourth Amendment. Tellingly, Plaintiffs' response does not mention, let alone defend, their Fourth Amendment claim.

2.EQUAL PROTECTION

Plaintiffs additionally assert a violation of 42 U.S.C. § 1983 under the Equal Protection Clause. They base this claim on the following: "there is a dramatic disparity between the way school officials interrogated, detained and seized the property of

the plaintiffs and they [sic] way Schrimsher was coddled on his way out of the schoolhouse doors." [DE 83 at p. 24]. Plaintiffs specifically assert that while "Schrimsher's electronic devices were retrieved and delivered to him before he left" and Schrimsher was told "not to write anything down or check the 'why' box on his resignation letter," that Plaintiffs "were detained and interrogated and had their cell phone seized." [*Id.*]. Yet nowhere do Plaintiffs offer case support for this notion instead citing one case dealing with unequal gender-based sports scheduling, which did not involve money damages.

Even if the Court takes Plaintiffs' version of facts as true, the Court will not take Plaintiffs' dramatized categorization as factual. The Board interviewed both K.G. and Schrimsher. The Board asked K.G. to hear the recordings, contacted K.G.'s parents soon after, and immediately apprehended Schrimsher ensuring he was removed from school property. Plaintiffs have failed to show that Plaintiffs even received unequal treatment.

Even if it was somehow inequitable for the Board to investigate K.G. concerning a tip that her phone contained inappropriate content that put K.G. and other students in danger while allowing Schrimsher's electronic devices to be retrieved before he was escorted off campus, Plaintiffs have failed to show how K.G.'s victimization was due to her gender. Plaintiffs' "equal protection claim is without a basis, and an equal protection claim

which is not supported by factual allegations should be dismissed as conclusory." *Hakim v. Booker,* No. 06-CV-103-JBC, 2006 U.S. Dist. LEXIS 79888, at *16 (E.D. Ky. Oct. 17, 2006).

### 3. BODILY INTEGRITY

Plaintiffs also allege the Board is liable under 42 U.S.C. § 1983 for the deprivation bodily integrity. [DE 1 at ¶ 199]. The Sixth Circuit has recognized a constitutional right under the substantive component of the Due Process Clause to bodily integrity, which is "the right to be free from sexual abuse at the hands of a state actor." *Claiborne Cty.*, 103 F.3d at 506. The court clarified that the right to bodily integrity protects children from teachers engaging in sexual abuse. "[A] schoolchild's right to personal security and to bodily integrity manifestly embraces the right to be free from sexual abuse at the hands of a public-school employee." *Id.*

Sexual abuse by Schrimsher would constitute a violation of a clearly established statutory right. Assuming the occurrence of sexual abuse is a genuine issue of material fact as Schrimsher denies any physical touching, the claim must nonetheless fail because Plaintiff cannot establish the second question required for § 1983 liability, whether the Board is responsible for the violation as described in the previous section.

### COUNT IV: VIOLATIONS OF KENTUCKY REVISED STATUTES

Count IV of Plaintiffs' complaint, "Damages Under KRS 446.070," seeks liability for "Defendants' violations of their ministerial obligations under KRS 156.095; 160.345; 158.154; 620.010; and 620.030 have caused and continue to cause Plaintiffs harm." [DE 1 at ¶ 204]. KRS 446.070 holds that a "person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation." Therefore, to recover, Plaintiffs must show that a statue has been violated, but they are unable to do so.

1. <u>KRS 156.095</u>

First, Plaintiffs claim KRS 156.095 was violated. The complaint focuses on the sections of the statute that require training in matters of child neglect at schools. The statute reads in part, "The Kentucky Department of Education shall develop and maintain a list of approved comprehensive evidence-informed trainings on child abuse and neglect prevention, recognition, and reporting that encompass child physical, sexual, and emotional abuse and neglect" and that "each local school board shall adopt one (1) or more training(s) from the list" and employees of the school "shall complete the implemented training(s)." Ky. Rev. Stat. Ann. § 156.095(8)(a) & (d).

Plaintiffs have not presented any argument showing how the statute was violated. The complaint merely quotes the statute. The only factually-based allegation related to the statute is that the

45

"Board is liable for damages in this case because...the board breached its duty to provide sufficient training or supervision to prevent the conduct alleged herein." [DE 1 at ¶ 154(d)]. Such a conclusory allegation cannot serve to defeat a motion for summary judgment.

   2. KRS 160.345, KRS 158.154, and KRS 620.030

   Second, Plaintiffs allege violation of KRS 160.345, which they declare "mandates compliant procedures and disciplinary actions" and KRS 158.154 and KRS 620.030, which they allege mandates "that Akers report Schrimsher to law enforcement in 2017." [DE 83 at ¶ 24]. Plaintiffs assert that these statutes along with the Board's own "mandatory policy of documenting all claims of sexual harassment" were violated, though details on how the statutes were broken are sparce. Reading Plaintiffs' briefs liberally it appears their contention with the Board falls mostly on the failure to report the sexual abuse to law enforcement as required by the statute.[2]

   First, KRS 620.345 is a lengthy statute defining and detailing school's decision-making councils. Plaintiffs have not explained

---

[2] The Complaint merely lists the duties Plaintiff alleges KRS 160.345, KRS. 158.154, and KRS 620.030 impose on the Board, but contains no allegations of how those statutes were broken. [DE 1 at ¶¶ 26-27, ¶¶ 35-40]. While the Response to Plaintiffs' motion for summary judgment provides more factual detail than the Complaint, Plaintiffs still do not explain how the statutes were violated: "In the case at hand, nothing was written down, Principal Akers did not report the abuse to law enforcement, and as a result the Board deprived K.G. and M.G. of the rights afforded to them by KRS 620.010." [DE 83 at p. 24].

how this statute was violated or referenced any case where the court found this statute to be violated.

Second, KRS 158.154 requires that "when the principal has a reasonable belief that an act has occurred on school property...involving assault resulting in serious physical injury, a sexual offense...the principal shall immediately report the act to the appropriate local law enforcement agency," and KRS. 620.030 requires "any person who knows or has reasonable cause to believe that a child is dependent, neglected, or abused shall immediately cause an oral or written report to be made to a local law enforcement agency..." Plaintiffs once again are brief in their analysis, however, the Court need not conduct a strenuous deduction of Plaintiffs' point because the Board is immune from suit.

Even if the Court were to find these statutes violated, summary judgment is nonetheless proper because the Board is entitled to governmental immunity. *James v. Wilson*, 95 S.W.3d 875, 903 (Ky. App. 2002). School boards are cloaked in governmental immunity when they perform governmental functions, unless the General Assembly waived its immunity. *Banks v. Breathitt Cty. Bd. of Educ.*, 925 F. Supp. 2d 856, 861 (E.D. Ky. 2013)(citing *Grayson County Board of Education v. Casey*, 157 S.W.3d 201, 202-03 (Ky. 2005)); *see Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001). The Court has held that education is an integral aspect of state government and that activities in direct furtherance of education

47

will be deemed governmental rather than proprietary." *Faul v. Bd. of Educ. of Danville Indep. Sch.*, No. 5:12-CV-277-KSF, 2013 U.S. Dist. LEXIS 51383, at *9 (E.D. Ky. Apr. 9, 2013). Presumably lacking any rebuttal, Plaintiffs fail to address Defendant's immunity argument in their Response.

## Count VII: False Imprisonment

Plaintiffs claim they were falsely imprisoned on August 16, 2018, when "The Board, acting through its authorized agents, told K.G. and M.G. that they could not leave the office or call their parents until after they had written a statement and (in K.G.'s case) given up her cellular device." [DE 1 at ¶ 199]. In their response Plaintiffs claim "Forgey and Wells, acting in their official capacities, detained Plaintiff in August 2018 against their will and in violation of their Constitutional rights." [DE 83 at p. 25]. Defendants are entitled to summary judgment because Plaintiffs have not provided any case law support for their novel theory, the detention was not unlawful or wrong, the Board was exercising their authoritative discretion, and the Board is entitled to immunity.

"False imprisonment is the intentional confinement or instigation of confinement of a plaintiff of which confinement the plaintiff is aware at the time." *Dunn*, 226 S.W.3d at 71. The confinement must be "without the person's consent" and "unlawful."

48

*Akers v. Roberts,* Nos. 2014-CA-001394-MR, 2014-CA-001778-MR, 2016 Ky. App. Unpub. LEXIS 248, at *15 (Ct. App. Mar. 25, 2016). Kentucky law is clear that "false imprisonment requires that the restraint be wrongful, improper, or without a claim of reasonable justification, authority or privilege." *Banks v. Fritsch*, 39 S.W.3d 474, 479 (Ky. Ct. App. 2001). Thus, an exception to liability for false imprisonment exists where there is "legal authority for the confinement." *Mills v. Owsley Cty. Kentucky*, 483 F. Supp. 3d 435, 477 (E.D. Ky. 2020) (quoting *Smith v. Stokes*, 54 S.W.3d 565, 567 (Ky. Ct. App. 2001)). Summary judgment must be granted for the Board because no reasonable jury could conclude that the brief time K.G. was held in the office in order to investigate the serious accusations of sexual predatoriness was "wrongful, improper, or without a claim of reasonable justification."

Plaintiffs cite to no authority that suggests the tort of false imprisonment should be expanded to hold school boards liable for taking a student victim of a potential sexual predator teacher into an office to further investigate the dangerous situation. A district court in Indiana granted summary judgment to defendants on the false imprisonment claim "arising out of a strip search that took place in the girls' locker room" because "to hold otherwise would give rise to ludicrous results" where "every student escorted to the office for investigation of a disciplinary

matter would have a claim for false imprisonment if that student was ultimately exonerated from discipline" and the principal "had every right to detain the girls while he investigated the matter." *Oliver by Hines v. McClung*, 919 F. Supp. 1206, 1219 (N.D. Ind. 1995). To decide differently in the present case would similarly "give rise to ludicrous results" as school boards would be sued for attempting to investigate dangerous situations involving teachers sexually preying on students.

A Kentucky district court dismissed a false imprisonment claim against defendants for "unlawfully [confining] Plaintiffs...within the confines of a room designated for in-school suspension." *Flege v. Williamstown Indep. Schs*, No. 06-47-DLB, 2007 U.S. Dist. LEXIS 14631, at *73 (E.D. Ky. Mar. 1, 2007). The court held that the moment the children arrived at school they were in the school's lawful custody and school administrators have the "authoritative and disciplinary discretion to determine where the children are to be located during the school day." *Id.* Plus, the "moment [the mother] was present to retain custody of her children, the school relinquished said custody." *Id*.

The logic of the *Flege* case shows that the Board's actions were lawful. The Board had the power to control the whereabouts of Plaintiffs from the moment they arrived on school property. As such, the brief investigation was lawful as the Board was

reasonably exercising their "authoritative and disciplinary discretion" and allowed Plaintiffs to leave with their parents.

Even so, the Board cannot be held liable for false imprisonment as they are entitled to governmental immunity as detailed previously. *Yanero*, 65 S.W.3d at 519. School boards are immune if performing a government function, and a performance has a government function if it is "integral to state government." *Tinch v. Jefferson Cty. Pub. Sch. Sys.,* Civil Action No. 3:12-cv-844-DJH, 2016 U.S. Dist. LEXIS 51927, at *12 (W.D. Ky. Apr. 18, 2016) (finding Jefferson County Board immune from defamation claims because responding to open records request is a government function); *Gugliotta v. Oldham Cty. Bd. of Educ*., No. 2017-CA-000417-MR, 2018 Ky. App. Unpub. LEXIS 289, at *13 (Ct. App. May 11, 2018)("By directing the enforcement of the compulsory attendance laws, the Oldham County Board of Education was performing a governmental function."). As investigating allegations of an inappropriate student and teacher relationship occurring on school property and during school hours is clearly a government function, the Board is immune.

### D. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT BOARD OF EDUCATION OF WOODFORD COUNTY AS TO VIOLATION OF TITLE IX SEXUAL DISCRIMINATION AND HARASSMENT

The third and final motion that needs to be addressed is Plaintiffs' Motion for Partial Summary Judgment on Count I, violation of Title IX Discrimination and Harassment under Title

IX. Plaintiffs assert this Title IX claim was violated in multiple ways, several of which are not applicable to the present situation. As the Board's motion on the same claim was denied due to remaining issues of material fact, so Plaintiffs' motion will also be denied.

First, Plaintiffs assert that Title IX precludes exclusion on the basis of sex from participation in an educational program or activity. [De 55 at p. 18]. Plaintiffs rely on *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018) for the notion that federally funded educational programs cannot credit one gender's testimony over the other based solely upon the gender difference. However, the case cannot be used in this context to support liability.

In *Doe v. Baum*, one theory of liability put forth by the plaintiff and accepted by the court was that the university violated Title IX "when it reaches an erroneous outcome in a student disciplinary proceeding because of the student's sex." *Baum*, 903 F.3d at 585 (6th Cir. 2018). John Doe and Jane Roe, both university students, attended a fraternity party, consumed alcoholic beverages, and eventually had sex. *Id.* at 579. Two days later Roe filed a sexual misconduct complaint with the university claiming she was too drunk to consent. *Id.* The university launched an investigation but there was conflicting testimony. While the investigator noted that Roe's witness may have been more credible, he recommended the administration rule in Doe's favor. *Id.* at 580. Roe appealed and the Court reversed. Doe then filed this lawsuit

52

based on the university's Title IX violations. *Id.* The Court found that at the motion to dismiss stage, it was possible that gender discrimination was the reason the defendants discredited Doe and his fraternity brother's testimony, while not holding Roe and her sorority sisters to the same standard. *Id.* at 586.

Plaintiffs here claim the witnesses were discredited because the Board believed Schrimsher to be uninterested in female students based on his sexual orientation. Thus, Plaintiffs claim K.G. was "denied the benefit of unbiased enforcement of...the County's anti-discrimination/ anti-harassment policies" which "mandates a document investigation and written reports of harassment/ discrimination complaints" all "because K.G. is a female." Our case is obviously factually distinct from *Doe v. Baum* as the incident is not student-on-student sexual misconduct and there is no discreditation of a witness' statement due to the gender of *that witness*.

First, Plaintiffs fail to point to any cases where this theory of liability has been extended to teacher-on-student sexual violations. Instead, case law cited only shows this theory being used in disciplinary hearing for student-on-student misconduct at universities. Second, if Plaintiffs' argument is that gender discrimination occurs when witnesses of one gender are credited over another gender, such cannot be the case here because the two witnesses of different gender – Gibbons and Goforth– appear to

have been equally considered and dismissed. Third, Plaintiffs fail to even mention the two elements for pleading an erroneous-outcome case, (1) "facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) a "particularized ... causal connection between the flawed outcome and gender bias," let alone to show how the lack of document investigation report can be considered a "disciplinary proceeding" for satisfying the element. *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016). While Plaintiffs' attempt to pigeon-hole the facts to meet this theory of Title IX violation is creative, the Court is unable to grant them summary judgment as the Court is not convinced the facts available permit recovery under such theory, no case law indicates such a result, Plaintiffs have failed to argue how the elements are met, and other theories of Title IX violations are more appropriate.

It is possible that Plaintiffs are attempting to create a new theory of Title IX liability altogether as they reference the witness credibility theory, but then assert that the "same can be said of dismissing or failing to investigate a complaint against an alleged perpetrator solely because of the gender of the victim." While this is novel theory, genuine issue of material fact remains on whether the Board's actions following the Goforth report can be considered a complete failure to investigate and whether the lack of recordation or further inquiry into the situation was actually

54

due to the assumption regarding Schrimsher's sexual orientation. Therefore, summary judgment is inappropriate.

Plaintiffs' second theory of liability under Count I of Title IX, that Plaintiffs were subjected to discrimination and harassment because of their sex, likewise does not warrant summary judgment. [DE 55 at p. 19]. Assuming only for the purposes of this memorandum that this theory of liability was allowed, Plaintiffs have failed to show the absence of genuine issues of material fact. Plaintiffs assert that they were intentionally discriminated against because the "County refused to investigate, document or discipline Schrimsher in 2017 because K.G. was a female." [*Id.* at p. 20]. However, genuine issues of material fact remain concerning the Board's rationale for their actions following the Goforth complaint and whether Schrimsher's alleged sexual orientation played a role. Plaintiffs have not foreclosed the possibility that the lack of further investigation was instead due to the Board's belief that no additional inquiry was necessary after both parties denied the accusations.

Plaintiffs' third theory of liability under Title IX is premised on vicarious liability claiming that the Board had actual knowledge of the sexual abuse in early 2017 and by not investigating fully and continuing to allow K.G. to enroll in Schrimsher's classes, the Board's response was deliberately indifferent. [DE 55 at p. 21]. As described in the Court's denial

of the Board's motion for summary judgment regarding the same theory, genuine issues of material fact remain regarding what the Board actually knew and in turn, considering what they knew, whether their response qualifies as deliberately indifferent.

Plaintiffs' fourth theory of liability under Title IX declares that the Board created a hostile environment for plaintiffs as well as other minor females due to the Board's "repeated mishandlings of similar, and in some case identical, instances of teacher-on-student sexual harassment," and "failure to preserve evidence." [DE 55 at p. 23]. The hostile environment theory has been recognized in the Sixth Circuit. *Claiborne Cty.*, 103 F.3d at 515. While it overlaps with the deliberate indifference theory, it has distinct elements. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018).

"To establish a prima facie case for hostile environment under Title IX, [Plaintiffs] must produce evidence that her educational experience was 'permeated with discriminatory intimidation, ridicule and insult that [was] sufficiently severe or pervasive to alter the conditions' of her education and create a sexually hostile environment." *Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp. 2d 679, 685 (W.D. Ky. 2003)(citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). "The conduct complained of is judged both objectively and subjectively; it must be

sufficiently severe or pervasive to create an environment that a reasonable person would find hostile." *Id.*

While the Court does not foreclose the possibility that the Board's response to the sexual misconduct of Schrimsher and other teachers could have created an experience "permeated with discriminatory intimidation, ridicule and insult that [was] sufficiently severe or pervasive to alter the conditions" of students' education, Plaintiffs have not plead facts sufficient to convince the Court that they should be entitled to judgment as a matter of law at this stage. As mentioned *ad nauseam*, genuine issues of material fact remain regarding when the Board had knowledge and whether their response was appropriate, both of which factor into the hostile environment analysis. "Finally, whether conduct about which a plaintiff complains created a 'hostile environment' under Title IX, and whether the educational entity took appropriate action after knowing of inappropriate conduct, are factual questions for the jury to resolve." *Claiborne Cty.*, 103 F.3d at 515.

No theory that Plaintiffs have put forward under Count I of Title IX Discrimination entitle them to summary judgment at this time. In fact, some theories are likely inapplicable to the situation. Therefore, Plaintiffs' Motion for Partial Summary Judgment [DE 55] is denied.

## IV. CONCLUSION

It is **HEREBY ORDERED** as follows:

(1)   Defendant Board of Education of Woodford County's Motion for Summary Judgment [DE 76] is **GRANTED** as to Counts II, III, IV, V, VI, and VII. As to Count I, the Motion is **DENIED.**

(2)   Plaintiffs' Motion for Partial Summary Judgment against Defendant Board of Education of Woodford County [DE 55] and Motion for Partial Summary Judgment against Defendant J. Cooper Schrimsher [DE 67] is **DENIED.**

This the 19th day of January, 2022.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge

58